**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION**

| | |
|---|---|
| **H-D U.S.A., LLC and HARLEY-DAVIDSON MOTOR COMPANY GROUP, LLC,** | Case No.: 17-CV-711 |
| Plaintiffs, | |
| vs. | **COMPLAINT FOR TRADEMARK COUNTERFEITING, TRADEMARK INFRINGEMENT, TRADEMARK DILUTION, COPYRIGHT INFRINGEMENT, AND UNFAIR COMPETITION** |
| **SUNFROG, LLC d/b/a SUNFROG SHIRTS and JOHN DOES,** | |
| Defendants. | |
| | **JURY TRIAL REQUESTED** |

**COMPLAINT**

Plaintiffs H-D U.S.A., LLC and Harley-Davidson Motor Company Group, LLC (Plaintiffs and their predecessors in interest, together with their parents, subsidiaries, and affiliated companies are collectively referred to as "H-D"), by their undersigned attorneys, bring this action against SunFrog, LLC d/b/a SunFrog Shirts ("SunFrog") and John Does (collectively "Defendants") and allege as follows, upon actual knowledge with respect to themselves and their own acts, and upon information and belief as to all other matters:

**NATURE OF THE ACTION**

1.      This is a civil action for trademark counterfeiting, trademark infringement, trademark dilution, copyright infringement, and unfair competition arising under the Lanham Act, 15 U.S.C. § 1051, *et seq.*, the Copyright Action, 17 U.S.C. § 101, *et seq.*, Wisconsin state law, and common law.  H-D seeks equitable and monetary relief for Defendants' actions that

constitute willful violations of H-D's trademark rights in its HARLEY-DAVIDSON, HARLEY,

H-D, HD, FAT BOY, and SPORTSTER word marks; and its Bar & Shield Logo, Willie G. Skull

Logo, and Number 1 Logo trademarks shown below (collectively, "the H-D Marks"); and H-D's

copyright rights in the Willie G. Skull Logo (collectively with the H-D Marks, "H-D's

Intellectual Property").

| The "Bar & Shield Logo" | The "Willie G. Skull Logo" | The "Number 1 Logo" |
|---|---|---|



2.      Defendants are in the business of marketing, promoting, advertising, and selling

apparel and other products on SunFrog's website accessible via the domain names

SUNFROG.COM and SUNFROGSHIRTS.COM ("SunFrog's Website").

3.      Defendants market, promote, advertise, and sell products, primarily apparel, that

bear H-D's Intellectual Property (the "Infringing Products") on SunFrog's Website.  H-D has

placed Defendants on express notice of H-D's trademark rights by submitting numerous

objections, starting in October 2016 and continuing to the present, encompassing well over 800

items offered and sold by Defendants that are the subject of this Complaint.  Despite such

repeated objections and despite the fame of the H-D Marks, Defendants nonetheless continued,

and continue to this day, to market, promote, advertise, and sell Infringing Products bearing

H-D's Intellectual Property on SunFrog's Website.

2

4.       Specifically, despite H-D's countless objections: (a) SunFrog continues to advertise and sell numerous Infringing Products bearing the identical H-D Marks cited in H-D's prior objections, (b) SunFrog continues to allow the same anonymous sellers that are repeat infringers of H-D's Intellectual Property and identified in H-D's prior objections to offer additional Infringing Products on SunFrog's Website, (c) SunFrog expanded the types of Infringing Products it sells from shirts bearing the H-D Marks to also include leggings and mugs, and (d) SunFrog even continues to advertise and sell numerous Infringing Products bearing designs *identical* to designs of Infringing Products that were the subject of H-D's prior objections.  In March and April 2017 alone – at the same time that H-D was repeatedly submitting objections to SunFrog's violations of the H-D Marks and following many months of similar objections by H-D – the Infringing Products sold on SunFrog's Website have featured more than 100 different designs comprised of or containing the H-D Marks on thousands of products.  Representative examples of the Infringing Products offered and sold by Defendants are shown below:







Case 2:17-cv-00711-JPS   Filed 05/19/17   Page 5 of 48   Document 1

  

5.     Defendants' unlawful activities described below: infringe the H-D Marks; are likely to dilute and tarnish the famous HARLEY-DAVIDSON, HARLEY, H-D, HD, and Bar & Shield Logo marks; constitute trademark counterfeiting of the H-D Marks that cover apparel, posters, and/or mugs; infringe H-D's copyright in the Willie G. Skull Logo; and/or constitute unfair competition; and have caused and will continue to cause, unless enjoined, irreparable harm to H-D, H-D's Intellectual Property, and the consuming public.

6.     H-D seeks injunctive and other relief from Defendants' unauthorized use of H-D's Intellectual Property, including without limitation an injunction enjoining Defendants from engaging in their unlawful activities, statutory damages for counterfeiting, statutory damages for copyright infringement, Defendants' profits, H-D's actual damages, and H-D's attorneys' fees and costs.

**THE PARTIES**

7.     Plaintiff H-D U.S.A., LLC is a Wisconsin limited liability company having a principal place of business at 3700 West Juneau Avenue, Milwaukee, Wisconsin 53208, and is the owner of the trademarks and copyright asserted in this action, i.e. H-D's Intellectual Property.

8.     Plaintiff Harley-Davidson Motor Company Group, LLC d/b/a Harley-Davidson Motor Company is a Wisconsin limited liability company having its principal place of business

6

at 3700 W. Juneau Avenue, Milwaukee, Wisconsin 53208, and is a licensee of H-D's Intellectual Property.

9.     Defendant SunFrog, LLC d/b/a SunFrog Shirts is a limited liability company organized under the laws of the State of Michigan, with its principal place of business at 1782 O'Rourke Blvd., Gaylord, Michigan 49735.  SunFrog is not an authorized H-D dealer and is not an authorized licensee of any of H-D's Intellectual Property.

10.     H-D is not aware of the true name and capacity of the other persons acting in concert with and/or at the request or direction of SunFrog who have participated in the creation, promotion, advertisement, sale, manufacturing, printing, and/or distribution of the Infringing Products described in this Complaint, including but not limited to SunFrog's account holders that contracted with SunFrog to create, offer, and sell the Infringing Products.  Thus, H-D brings this action against these other defendants identified as the "John Does."

## JURISDICTION AND VENUE

11.     This action arises under the federal Trademark Act, 15 U.S.C. §§ 1051, *et seq.,* the Copyright Action, 17 U.S.C. § 101, *et seq.,* Wisconsin state law, and common law.

12.     This Court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. § 1121, 17 U.S.C. § 501, and 28 U.S.C. §§ 1331 and 1338(a) and (b).  Because the parties are citizens of different states and the matter in controversy exceeds the sum or value of seventy-five thousand dollars ($75,000.00), exclusive of interest and costs, this Court also has jurisdiction under 28 U.S.C. § 1332.  Jurisdiction over the state law claims is also appropriate under 28 U.S.C. § 1367(a) and principles of pendent jurisdiction because those claims are substantially related to the federal claims.

7

13.     This Court has personal jurisdiction over Defendants and venue is proper pursuant to 28 U.S.C. §§ 1391(b) and (c).  Venue is also proper because Defendants are subject to personal jurisdiction in this District.

## H-D, ITS PRODUCTS AND SERVICES,
## AND ITS TRADEMARKS

14.     H-D is a world-famous manufacturer of motorcycles and a wide variety of other products and services, including apparel products.  H-D is the largest U.S. manufacturer of motorcycles.

15.     Founded in 1903, H-D has manufactured, promoted, and sold motorcycles and related products for over 110 years.

16.     H-D owns the exclusive right to use the H-D Marks and variations thereof for motorcycles and related products and services, including clothing and accessories.

17.     Since at least as early as 1903, H-D has used and promoted the HARLEY-DAVIDSON mark for motorcycles, motorcycle parts, and motorcycle accessories.

18.     Since at least as early as 1915, H-D has used the HARLEY-DAVIDSON mark in connection with apparel, and has used this mark for mugs and posters for many years.

19.     Since at least as early as 1980, H-D has also used the HARLEY trademark in connection with motorcycles, motorcycle parts and accessories, motorcycle clothing, and various other products and services.  H-D has used the HARLEY mark for many years for apparel, mugs, posters, and other merchandise.

20.     Since at least as early as 1912, H-D has used and promoted the H-D mark and/or its variation without the hyphen "HD" in connection with motorcycles.  In addition, H-D has used the H-D and HD marks for decades for motorcycle parts and accessories, motorcycle clothing, and various other products and services under the those marks.  The marks HARLEY,

8

H-D, and HD have for many years been used interchangeably by the public as shorthands for HARLEY-DAVIDSON.

21.    Since at least as early as 1910, H-D has used the distinctive Bar & Shield Logo mark and variations thereof in the U.S., representative examples of which are shown below (collectively referred to as the "Bar & Shield Logo"), in connection with motorcycles and related products and services.  H-D's rights in the Bar & Shield Logo extend to the mark's design (i.e., the bar and shield design), regardless of the wording contained within that design.



22.    Since at least 1915, H-D has used the Bar & Shield Logo in connection with apparel, and has used this mark for mugs and posters for many years.

23.    Since at least the early 1970s, H-D has used the #1 Logo and variations thereof, examples of which are shown below, in connection with motorcycles, apparel, mugs, posters, and/or related products (collectively, the "Number 1 Logo").



24.    Since at least 2000, H-D has used its Willie G. Skull Logo, examples of which are shown below, in connection with a wide variety of goods including apparel, mugs, posters, motorcycles, motorcycle parts, and motorcycle accessories.  H-D has also extensively used the Willie G. Skull Logo in connection with a wide variety of other goods, including jewelry, watches, footwear, wallets, clocks, and pins.



25.    The Willie G. Skull Logo was created by Willie G. Davidson ("Willie G."), the son of former Harley-Davidson president William H. Davidson and the grandson of Harley-Davidson co-founder William A. Davidson, and Ray Drea.  Willie G. has held numerous positions within Harley-Davidson, including former Senior Vice President & Chief Styling Officer of Harley-Davidson, and the head of Harley-Davidson's Willie G. Davidson Product Development Center.  During his career, Willie G. was responsible for approving H-D motorcycle designs, and he also personally designed the Willie G. Skull Logo.  Willie G., an icon in the motorcycle industry, was inducted into the American Motorcyclist Association Motorcycle Hall of Fame in 1999.  In 2014, he was inducted into the Motorcycle Hall of Fame as a "Motorcycle Hall of Fame Legend."

26.    Since at least 1989, H-D has used and promoted the FAT BOY mark in connection with motorcycles.  In addition, H-D has used the FAT BOY mark for many years for motorcycle parts and accessories, clothing, and various other products.

27.     Since at least 1956, H-D has used and promoted the SPORTSTER mark in connection with motorcycles.  In addition, H-D has used the SPORTSTER mark for many years for motorcycle parts and accessories, clothing, and various other products.

28.     Over the years, H-D has expanded its business to include a wide range of other products and services, including but not limited to accessories, patches, signs, collectibles, and more.  H-D has extensively promoted the H-D Marks across H-D's extensive line of products and services over the years.

29.     Apparel is a significant part of H-D's business and has been so for many years. For decades, H-D has offered and sold, itself and through its dealers and licensees, riding gear and apparel bearing the H-D Marks, including t-shirts, shirts, sweatshirts, sweaters, pants, vests, jackets, and hats.  During this same time, H-D has offered and sold through H-D's licensees a wide range of merchandise bearing the H-D Marks, including many licensees for various apparel products, as well as licensees for mugs and posters.  Representative examples of H-D's licensed apparel products and mugs are shown below.

  









  

30.     Numerous authorized licensees of H-D in the U.S. sell and have sold for decades a wide range of merchandise bearing the H-D Marks, including many licensees specifically for various apparel products, as well as licensees for mugs and posters.

31.     The H-D Marks are premium brands and H-D has a reputation for providing a wide variety of high-quality merchandise under those brands itself and through its dealers and licensees.  Given the incredible commercial success of H-D's motorcycle business over the years and its status for many years as a famous, iconic, and cult brand, there has long been a strong demand from motorcycle enthusiasts as well as the general public for other products bearing the H-D Marks, so they can show their affinity for H-D and its products and brands.  To satisfy this demand and to further build awareness of the H-D Marks, H-D has for decades engaged in an extensive program licensing the H-D Marks (and other trademarks) to various licensees for use on a wide range of products including apparel, mugs, and posters just to name a few.  Consistent with its image as a premium brand,  H-D positions its licensed merchandise as high-quality merchandise at a premium price point.  H-D's licensed products and/or associated labeling and packaging bear one or more of the H-D Marks.

32.     H-D has standards and guidelines to which all authorized licensed products branded with the H-D Marks, including apparel, must adhere.  These standards and guidelines allow H-D to control the quality and appearance, among other things, of licensed products offered in connection with the H-D Marks.  Moreover, all licensed merchandise, including

13

apparel, is subject to H-D's prior written approval before it is manufactured, promoted, and sold to the public by H-D's licensees. To ensure and maintain the premium and high-quality reputation of licensed merchandise sold under the H-D Marks, H-D requires its licensees, including its licensees for apparel, mugs, and posters, to comply with its extensive and stringent quality-control standards, including: (1) licensees must first submit product concepts and artwork for H-D's prior written approval, (2) once the concept and artwork is approved, licensees must submit a pre-production product sample for H-D's prior written approval, and (3) once the pre-production product sample is approved, licensees must submit for H-D's prior written approval a production sample of the actual product that will be sold to the public. Licensees cannot promote or advertise any licensed products without completing all of these steps. As part of this quality-control review process, H-D carefully reviews the licensed products in numerous respects, including the materials used in making the licensed products, the quality of the craftsmanship and construction of the products, the design, style, and appearance of the products, and the overall quality of the products.

33. H-D has achieved significant commercial success in the motorcycle business, which includes the sales and servicing of motorcycles and the sales of motorcycle parts, accessories, and riding gear. H-D and its authorized dealers have sold many billions of dollars of such products and services over the years. H-D's licensed products business has also been wildly successful with H-D's royalty revenues from licensing exceeding $400 million during 2005-2016 alone, which translates into billions of dollars of sales at retail. The majority of H-D's licensing royalty revenues are from its apparel licensees. H-D currently has approximately ten apparel licensees and has had a similar number of apparel licensees or more for many years.

34.     The H-D Marks have been extensively promoted nationwide across H-D's many product lines.  H-D markets and sells motorcycles, motorcycle parts and accessories, and riding gear including apparel under the H-D Marks through a network of more than 690 authorized dealers located throughout the country, and through numerous other authorized Harley-Davidson retail outlets, including high-profile and highly-trafficked outlets (e.g., stores located at popular airports).

35.     H-D's apparel products are also sold online through its HARLEY-DAVIDSON.COM website, authorized dealers' websites, and websites of H-D's authorized licensees.

36.     H-D and its authorized dealers and licensees have sold many billions of dollars of products and services under the HARLEY-DAVIDSON, HARLEY, H-D, HD, and Bar & Shield Logo marks over the years, and have expended many millions of dollars advertising and promoting those marks through virtually every media.  For example, H-D has promoted its products and services under such marks through dealer promotions, catalogs, customer events, industry events, motorcycle-enthusiast events, direct mailings, national television, print, and radio advertisements, and the Internet.  For many years, H-D and its dealers have sponsored sports teams and major sporting events, including prominent use of the H-D Marks on advertisements or promotions at such events.

37.     H-D, its products and services, and its H-D Marks have all received significant unsolicited media coverage for decades, including, for example, in national publications such as *Business Week*, *The Chicago Tribune, The New York Times, The Wall Street Journal, The Washington Post,* and *USA Today,* as well as in books, numerous national television programs

and popular online publications and websites, such as MSNBC, CNN Money, CNN.COM, and Yahoo.

38.     As a result of H-D's significant promotional efforts, commercial success, and popularity for decades, the HARLEY-DAVIDSON brand has been ranked annually for the past decade among the top 100 most valuable brands in the world by Interbrand, a leading independent branding firm.  In 2015, Interbrand estimated the value of the HARLEY-DAVIDSON brand at US $5.46 billion.  In 2016, Tenet Partners ranked the HARLEY-DAVIDSON brand as the 11th Most Powerful Brand in its Top 100 Most Powerful Brands report of 2016.

39.     Based on H-D's longstanding and extensive use of the HARLEY-DAVIDSON, HARLEY, H-D, HD, and Bar & Shield Logo marks, and the widespread advertising, publicity, promotion, and substantial sales of products and services under those marks, these marks have been well known and famous to both the general public and the motorcycling public for many years.

40.     In *H-D Michigan LLC v. Broehm*, Opposition No. 91177156, the Trademark Trial and Appeal Board of the United States Patent and Trademark Office ("Board") expressly held that the HARLEY-DAVIDSON, HARLEY, and Bar & Shield Logo marks were famous for motorcycles, apparel, and accessories.  2009 WL 1227921, at *5 (TTAB 2009).  Further, the Board held that the Bar & Shield Logo was a famous mark for such products *regardless of the wording and other matter displayed within the Bar & Shield Logo*.  As a result, the Board held that the third-party mark shown below was confusingly similar to the Bar & Shield Logo despite the differences in wording within the logo and despite the changes to the shape of the shield portion of the mark.



41.     Various federal courts, including this Court, have found that the HARLEY-

DAVIDSON mark and/or the Bar & Shield Logo are famous.  See *Ronda Ag v. H-D, Inc.,* 108

F.3d 1393, at *1 (Fed. Cir. 1997) (finding HARLEY-DAVIDSON famous) (non-precedential);

*H-D Michigan, LLC v. Hellenic Duty Free Shops S.A.,* No. 2:11-CV-00742, 2011 WL 3903278,

at *1 (E.D. Wis. Sept. 6, 2011) (finding HARLEY-DAVIDSON and Bar & Shield Logo

famous); *Packaging Supplies, Inc. v. H-D, Inc.,* No. 08-CV-400, 2011 WL 1811446, at *2 (N.D.

Ill. May 12, 2011) (finding HARLEY-DAVIDSON and Bar & Shield Logo famous); *H-D*

*Michigan, LLC v. Hannon,* No. 09-378-P-S, 2009 WL 3762445, at *1 (D. Me. Oct. 28, 2009)

(finding Bar & Shield Logo famous).

## H-D'S TRADEMARK REGISTRATIONS

42.     In addition to its longstanding and strong common-law rights in the HARLEY-

DAVIDSON mark, H-D owns, among others, the following federal registrations for the

HARLEY-DAVIDSON mark:

| Mark | Reg. No. Reg. Date | Goods and Services |
|---|---|---|
| HARLEY-DAVIDSON | 3393840 03-11-2008 | House mark for a full line of clothing, footwear and headwear |
| HARLEY-DAVIDSON | 0507163 03-01-1949 | Motorcycle shirts, sweaters, breeches, neckties, coveralls, rain coats and hats, jackets, helmets, caps and boots |
| HARLEY-DAVIDSON | 1234404 04-12-1983 | Sunglasses and protective helmets for motorcyclists; Clothing-namely, jackets, pants, shirts, T-shirts, vests, jeans, riding suits, bandanas, rain suits, shorts, |

| Mark | Reg. No. Reg. Date | Goods and Services |
|------|--------------------|--------------------|
| | | nightgowns, halters, underwear, tank tops, sweatshirts, night shirts, socks, gloves, hats, caps and boots |
| HARLEY-DAVIDSON | 1450348 08-04-1987 | Bumper stickers, removable tattoos, pressure sensitive decals, mugs, drinking glasses, coasters, decanters, cups, plastic mugs, towels, sweat pants, sweaters, suspenders, scarves, bandanas, leather clothing, namely, jackets, vests, gloves, jeans, chaps, tops, boots, shorts, caps, belts and parts of footwear, namely boot tips; (Among other good and services in Classes 6, 8, 14, 16, 18, 20, 24, 28, and 34.) |
| HARLEY-DAVIDSON | 0526750 06-27-1950 | Motorcycles and structural parts thereof, accessories- namely, intermediate stands, seats, foot rests and extensions, windshields, fender tips, exhaust stacks, grips, name plates, saddle covers, luggage carriers, license frames, foot pedal pads, tandem seats, foot rests, rear view mirrors |
| HARLEY-DAVIDSON | 1311457 12-25-1984 | Retail store services in the field of motorcycles, repair and servicing of motorcycles |
| HARLEY-DAVIDSON | 1219955 12-14-1982 | Parts and service manuals for motorcycles, parts catalogs for motorcycles, newsletters and magazines dealing with motorcycles, calendars, posters, and decals |

43.     In addition to its longstanding and strong common-law rights in the HARLEY

mark, H-D owns, among others, the following federal registrations:

| Mark | Reg. No. Reg. Date | Goods and Services |
|------|--------------------|--------------------|
| HARLEY | 1406876 08-26-1986 | Clothing; namely--tee shirts for men, women and children; knit tops for women and girls; and children's shirts |
| HARLEY | 1683455 04-14-1992 | Shirts, tank tops, boots and sweatshirts |
| HARLEY | 1708362 08-18-1992 | Embroidered patches for clothing |

| Mark | Reg. No. Reg. Date | Goods and Services |
| --- | --- | --- |
| HARLEY | 1352679 08-06-1985 | Motorcycles |

44.    In addition to its longstanding and strong common-law rights in the H-D and HD

marks, H-D owns, among others, the following federal registrations:

| Mark | Reg. No. Reg. Date | Goods and Services |
| --- | --- | --- |
| HD | 2315877 02-08-2000 | Shirts, jackets, vests, t-shirts, nightgowns, sweatshirts, nightshirts, gloves, hats, leather gloves |
| HD | 1534449 04-11-1989 | Decorative cloth patches and belt buckles of non-precious metal |
| H-D | 1775905 06-08-1993 | Shirts, jackets, vests, lingerie, belts, t-shirts, sweaters, pants, rain coats, nightgowns, halters, tank tops, sweatshirts, nightshirts, gloves, hats, chaps, wristbands, footwear, shorts, scarves, jeans, leather jackets, leather vests, leather chaps, leather belts, leather boots, leather gloves |
| H-D | 1596518 05-15-1990 | Jackets, vests, gloves, t-shirts, and caps |
| H-D | 1239313 05-24-1983 | Motorcycles |
| H-D | 5032178 08-30-2016 | Online retail store services featuring clothing, clothing accessories, footwear, motorcycle safety equipment, headwear, eyewear, motorcycle parts and accessories, and household items |

45.    In addition to its longstanding and strong common-law rights in its Bar & Shield

Logo, H-D owns, among others, the following federal registrations:

| Mark | Reg. No. Reg. Date | Goods and Services |
| --- | --- | --- |
|  | 3393839 03-11-2008 | House mark for a full line of clothing, footwear and headwear |

| Mark | Reg. No. Reg. Date | Goods and Services |
|------|--------------------|--------------------|
|  | 1511060 11-01-1988 | Clothing, namely, boots, sweat shirts, jeans, hats, caps, scarves, motorcycle riding suits, neck ties, shirts, t-shirts, jackets, vest, ladies tops, bandanas |
|  | 1571032 12-12-1989 | Clothing, namely, jeans, t-shirts and jackets |
|  | 3185946 12-19-2006 | Jackets, baseball hats, caps, shirts and T-shirts |
|  | 1205380 08-17-1982 | Motorcycles; Clothing-namely, T-shirts |
|  | 3058720 02-14-2006 | Retail store services and distributorships in the fields of motorcycles, motorcycle parts and accessories, footwear, clothing, jewelry, and leather goods; rendering technical assistance in the establishment, operation, and business promotion of retail stores; retail store services in the fields of motorcycles, motorcycle parts and accessories, footwear, clothing, jewelry, and leather goods therefor via a global computer network; dealerships in the fields of motorcycles, motorcycle parts and accessories, footwear, clothing, jewelry, and leather goods |
|  | 1660539 10-15-1991 | Motorcycles and motorcycle parts; namely, air cleaners, drive belts, belt guards, brakes, chains, clutches, crankcases, engine cylinders, fenders and fender supports, footboards, forks, fuel tanks, leg guards, handlebars, cylinder heads, mirrors, oil filters, oil pumps, seats, shock absorbers, backrests, wheels, and windshields; Books about motorcycles, calendars, decals, pens, photo albums, posters, and removable tattoos; |

| Mark | Reg. No. Reg. Date | Goods and Services |
|---|---|---|
| | | Drinking glasses, mugs, and can holders in the nature of an insulated rubber cylinder; <br><br> Belts, chaps, denim pants, gloves, hats, caps, jackets, neckties, night shirts, pants, rain suits, shirts, socks, suspenders, sweaters, sweatshirts, tank tops, athletic shoes, shoes, boots, t-shirts, underwear, vests, and wristbands; <br><br> (Among other goods and services in Classes 8, 9, 11, 14, 18, 20, 24, 26, 27, 28, and 34.) |
|  | 1263936 01-17-1984 | Mugs and Insulated Drinking Steins; <br><br> Clothing-Namely, T-Shirts, Jackets, Blue Jeans, Sweat Shirts, Underwear, Bandanas, Headwear, Socks, Boots, Cycle Riding Suits, Belts and Suspenders; <br><br> Embroidered patches; <br><br> Posters, paper decals; <br><br> (Among other goods and services in Classes 6, 9, 11, 12, 14, 16, 18, 20, 24, 26, and 34.) |

46.     In addition to its longstanding and strong common-law rights in the Willie G.

Skull Logo, H-D owns, among others, the following federal registrations:

| Mark | Reg. No. Reg. Date | Goods and Services |
|---|---|---|
|  | 4465604 01-14-2014 | Clothing, namely, shirts, hats, caps, belts, jackets, gloves, sweatshirts, lounge pants, wrist bands |

| Mark | Reg. No.<br>Reg. Date | Goods and Services |
|---|---|---|
|  | 3525970<br>10-28-2008 | Jackets, coats, gloves, shirts, shorts, caps, hats, headwear, knit hats, belts, neckties, pants, sweatshirts, T-shirts, leather clothing, namely, leather jackets, leather gloves, footwear, namely, boots and vest extenders |
|  | 3097410<br>05-30-2006 | Motorcycle parts and accessories, namely, derby covers, timer covers, air cleaner inserts, namely covers, gas cap medallions, fender skirts, console doors for fuel tanks, valve caps, license plate fasteners, foot board inserts, brake pedal pads, foot pegs, shifter pegs, heel rests, fuel tank panels, handle bar grips |
|  | 4465650<br>01-14-2014 | Motorcycles and structural parts therefor |
|  | 4844360<br>11-03-2015 | Parts of motorcycles, excluding parts of all motors and engines, namely, derby covers, air cleaner trim, timer covers, battery cover band, fuel caps, brake caliper inserts, fender skirts, console doors, head lamp visors, medallions, foot pegs, gearshift linkages, foot board covers, handlebar clamps, hand grips, fuel gauges, guard rail inserts, axle nut covers, breather end cap, valve stem caps, foot boards, turn signal visors, pivot bolt covers, tank panel, fender tip lens kit, console insert, air cleaner cover, decorative end caps, mirrors and mounting hardware for the aforesaid goods |
|  | 3040629<br>01-10-2006 | Mugs, beverage glassware |

47.    In addition to its longstanding and strong common-law rights in the Number 1 Logo, H-D owns, among others, the following federal registrations:

| Mark | Reg. No. Reg. Date | Goods and Services |
|---|---|---|
|  | 2973501 07-19-2005 | Bandanas, jackets, shirts, caps, hats, t-shirts, leather jackets |
|  | 3697875 10-20-2009 | Shirts, hats, caps |
|  | 2979002 07-26-2005 | Drinking glasses, mugs, beverage glassware |
|  | 4487292 02-25-2014 | Motorcycles and structural parts therefore |
|  | 3697874 10-20-2009 | Motorcycles and structural parts therefor |

48.    In addition to its longstanding and strong common-law rights in the FAT BOY mark, H-D owns the following federal registrations:

23

| Mark | Reg. No. Reg. Date | Goods and Services |
|------|------|------|
| FAT BOY | 1594104 05-01-1990 | Motorcycles |
| FAT BOY | 3818854 07-13-2010 | Non-luminous, non-mechanical tin signs, non-luminous, non-mechanical metal signs |

49.  In addition to its longstanding and strong common-law rights in the SPORTSTER mark, H-D owns the following federal registrations:

| Mark | Reg. No. Reg. Date | Goods and Services |
|------|------|------|
| SPORTSTER | 0912532 06-08-1971 | Motorcycles |
| SPORTSTER | 3044788 01-17-2006 | Embroidered patches and emblems for clothing |

50.  The federal trademark registrations listed above are prima facie evidence of H-D's ownership and the validity of those registered trademarks. Further, many of these registrations are incontestable, and thus constitute conclusive evidence of H-D's exclusive right to use those marks for the products and/or services specified in those registrations pursuant to 15 U.S.C. §§ 1065 and 1115(b).

51.  H-D also owns the following Wisconsin state trademark registrations for the HARLEY-DAVIDSON, HARLEY, H-D, HD, and Bar & Shield Logo marks:

| Mark | Reg. Date | Goods and Services |
|------|------|------|
| HARLEY-DAVIDSON | 11-18-2009 | Motorcycles, motorcycle parts, jewelry, clothing, caps/headwear, leather goods, decals/stickers, patches, belt buckles, and signs. |
| HARLEY | 11-18-2009 | Motorcycles, motorcycle parts, jewelry, clothing, caps/headwear, leather goods, decals/stickers, patches, belt buckles, and signs. |
| H-D | 11-18-2009 | Motorcycles, motorcycle parts, jewelry, |

| Mark | Reg. Date | Goods and Services |
|---|---|---|
| | | clothing, caps/headwear, leather goods, decals/stickers, patches, belt buckles, and signs. |
| HD | 11-18-2009 | Motorcycles, motorcycle parts, jewelry, clothing, caps/headwear, leather goods, decals/stickers, patches, belt buckles, and signs. |
|  | 11-18-2009 | Motorcycles, motorcycle parts, jewelry, clothing, caps/headwear, leather goods, decals/stickers, patches, belt buckles, and signs. |
|  | 11-18-2009 | Motorcycles, motorcycle parts, jewelry, clothing, caps/headwear, leather goods, decals/stickers, patches, belt buckles, and signs. |

## H-D'S COPYRIGHT REGISTRATION

52.     The Willie G. Skull Logo is an original work of authorship that constitutes copyrightable subject matter under U.S. law.  H-D is the owner of all copyright rights in the Willie G. Skull Logo, all preexisting works containing the Willie G. Skull Logo, and all derivative works of the Willie G. Skull Logo.  H-D owns U.S. Copyright Reg. No. VA 1-987-746, which issued on February 3, 2016.

53.     The copyright registration for the Willie G. Skull Logo listed above is valid and subsisting.  The copyright registration constitutes, in all instances, prima facie evidence of the validity of the copyright and the facts stated in the certificate.

## DEFENDANTS' WRONGFUL ACTS

### SunFrog's Business

54.     SunFrog is a service provider and fulfillment services platform that markets, promotes, advertises, and sells apparel, including t-shirts, sweatshirts, and hoodies, and other

products (e.g., mugs) on its Website. SunFrog's online services provided on SunFrog's Website include an online retail marketplace where consumers may purchase the products advertised on that site. SunFrog's Website also provides an online platform where individuals or businesses may open an account and "create" new products to advertise and sell on SunFrog's Website, and where they may advertise and sell products created by others that are already offered on SunFrog's Website. When consumers purchase products on SunFrog's Website, SunFrog handles the payment transaction, then prints and ships, or arranges to have printed and shipped, such products to the consumers. SunFrog has admitted in other litigations that it prints the products sold on SunFrog's Website. *See, e.g., Methodist Le Bonheur Healthcare v. SunFrog LLC*, No. 2:2016-cv-02718 (W.D. Tenn. Sept. 2, 2016), *Merchdirect LLC v. Sunfrog LLC et al,* No. 1-10 1:17-cv-00488-RJS (S.D.N.Y. Jan. 23, 2017). Moreover, in a promotional video on SunFrog's YouTube Channel, SunFrog describes and illustrates its fulfillment process, including printing and shipping and "quality control at every stage of [a customer's] order." SunFrog Shirts, *SunFrog B2B Multi-Location Apparel*, YOUTUBE (Sept. 2, 2016), youtube.com/watch?v=DtUIVgKtMtQ&t=3s. SunFrog earns the majority of the retail sales price of the products, and distributes a portion to its sellers.

55. SunFrog's sellers "create" products by selecting "blank" products (e.g., a t-shirt bearing no images, designs, or text) made available by SunFrog and then adding logos, images, and/or text (in SunFrog's terminology, "designs") to be printed on such products. SunFrog then advertises and offers products bearing the designs on SunFrog's Website. For example, an individual or business may open an account on SunFrog's Website, select a plain or blank t-shirt from SunFrog's list of available products, and add an image of H-D's HARLEY-DAVIDSON

trademark in just a few minutes.  The resulting product, a HARLEY-DAVIDSON t-shirt, is then advertised and sold on SunFrog's Website.

56.     SunFrog's sellers are essentially anonymous because they are identified on SunFrog's website only by invented account names and/or numerical codes that do not reveal the sellers' true names or contact information.

57.     Sellers may upload new designs from their own computers or devices to SunFrog's Website to create new products to sell on that site.  Sellers also have the option to select and sell existing designs that SunFrog makes available and provides to sellers in its online database titled "All SunFrog Art."  The All SunFrog Art database contains logos and images uploaded by SunFrog sellers, and is searchable by keyword and categories (e.g., "Automotive"). In particular, SunFrog's All SunFrog Art database makes available and provides to sellers numerous logos and images containing the H-D Marks (the "Infringing Designs") that can be immediately applied to numerous blank products of various styles, colors, and sizes, and offered for sale by sellers with just a few keystrokes.  SunFrog's searchable All SunFrog Art database, moreover, makes it easy for sellers to locate Infringing Designs containing the H-D Marks as they are instantly accessible by searching for the H-D Marks of interest (e.g., HARLEY, HARLEY-DAVIDSON, and HD).

58.     SunFrog earns the majority percentage (currently 54.5%) of the retail sales price of products sold on SunFrog's Website.  The remaining proceeds go to its sellers.  Sellers receive 40% of the retail sales price for the products they sell, and an extra 5.5% if they also created and uploaded the designs used on such products.  SunFrog refers to the 5.5% as a licensing fee it pays sellers for use of the designs.

27

59. SunFrog's contract with sellers allows it to keep sellers' commissions for itself under certain circumstances, including for sales of products that are the subject of infringement complaints by rights holders.

60. SunFrog facilitates and encourages the proliferation of products sold on SunFrog's Website in various ways. For example, sellers are not limited to creating and selling products with their own logos or images. Rather, sellers can also sell products with existing designs from the All SunFrog Art database, which put sellers in business without having any of their own designs or products. In addition, sellers receive a full 40% sellers' commission even for products bearing designs that the seller did not create, which is only slightly less than the payment received by sellers with their own designs.

61. In addition to advertising products directly on SunFrog's Website, SunFrog facilitates the advertisement and promotion of such products on social media sites (e.g., Facebook) by providing sales tracking tools to its sellers and offering tutorials for the marketing of such products on social media.

62. SunFrog prints, produces, and/or manufactures, or arranges to have printed, produced, and/or manufactured, products sold on SunFrog's Website to customers who purchase products on SunFrog's Website.

63. SunFrog ships, or arranges to have shipped, products sold on SunFrog's Website to customers who purchase products on SunFrog's Website.

64. SunFrog is thus not a passive participant in the business conducted by sellers on and through SunFrog's Website. This is not a situation where SunFrog's only role is to provide sellers with access to an online marketplace to sell their products and everything is done by the sellers. Rather, SunFrog is an active partner of the sellers and directly involved in the sellers'

business in many ways, all for SunFrog's financial gain, including: (a) SunFrog gives sellers the ability to sell products bearing designs of other sellers and encourages such sales by paying sellers 40% of the gross revenues from such sales, (b) SunFrog handles the payment transactions for the sales of all products sold on SunFrog's Website, (c) SunFrog prints or arranges for the printing of all products sold on SunFrog's Website, (d) SunFrog ships or arranges for the shipping of all products sold on SunFrog's Website, and (e) SunFrog provides to sellers sales tracking tools and tutorials for social media marketing of the Infringing Products.

### SunFrog's Repeated Infringement of H-D's Intellectual Property

65.     SunFrog has advertised, promoted, and sold hundreds, if not thousands, of products bearing H-D's Intellectual Property (as defined above, the "Infringing Products"). In March and April of 2017 alone, after and at the same time that H-D has been repeatedly submitting objections to SunFrog's violations of the H-D Marks, the Infringing Products offered on SunFrog's Website have featured more than 100 different Infringing Designs comprised of or containing the H-D Marks on thousands of products.

66.     SunFrog has profited handsomely from sales of the Infringing Products by receiving 54.5% of the retail sales price of each Infringing Product, and possibly more in some cases.

67.     The Infringing Products sold on SunFrog's Website have been designed and/or offered by numerous sellers that are anonymous as expressly allowed under SunFrog's platform. Such sellers include "harley davidson" and "HD," neither of which are H-D itself, as well as "LOKI," "POKA," "81088," and "75237," among many others. The anonymity provided by SunFrog to its sellers is a direct avenue for sellers to offer numerous Infringing Products with near impunity. SunFrog thus facilitates the widespread proliferation and offering of such

Infringing Products which are undoubtedly commercially successful given the high popularity and commercial success of H-D's own products bearing the H-D Marks, including clothing, mugs, and posters. Indeed, as described above, one of the few potential repercussions for sellers that offer Infringing Products is the withholding of sellers' commissions by SunFrog for its own gain and/or purposes. SunFrog is thus further incentivized to allow its anonymous sellers to offer Infringing Products.

68.     From at least as early as October 2016 to the present, H-D has submitted more than 70 complaints to SunFrog that: (a) notified SunFrog of H-D's rights in the H-D Marks, *and* (b) reported and objected to more than 800 Infringing Products that have been advertised, promoted, offered, and/or sold on SunFrog's Website in violation of H-D's rights.

69.     SunFrog has acknowledged the validity and infringement of H-D's Intellectual Property by responding to H-D's objections with the statement that "The design has been deactivated and should no longer be found on the SunFrog platform," and removing the sales pages for the complained-of Infringing Products (i.e., the pages on SunFrog's Website on which the Infringing Products can be purchased). SunFrog typically took 2-3 days and as long as 7 days to deactivate the objected-to Infringing Product. As detailed below, SunFrog's infringement report process and "remedy," however, are wholly inadequate to stop SunFrog's continuing and expanding violations of H-D's Intellectual Property.

70.     SunFrog's removal of the sales pages does not stop SunFrog from continuing to distribute such Infringing Products by fulfilling existing orders for such Infringing Products and from continuing to profit off of such products. In fact, SunFrog's contract with its sellers expressly permit it to fulfill orders for removed products and keep all proceeds from products that are the subject of infringement complaints.

71.     SunFrog continues to use its product URLs and sale-tracking URLs for "removed" Infringing Products to drive traffic to its Website for SunFrog's financial gain. Product URLs are used for sales pages on SunFrog's Website that display the product for sale. Sale-tracking URLs are also used for sales pages on SunFrog's Website, and include a tracking element such as the seller's 5-digit ID at the end of the URL. Specifically, SunFrog continues to use product URLs such as https://www.sunfrog.com/LifeStyle/**HARLEY-DAVIDSON**-159675044-Black-Guys.html, which is the URL for a sales page for an Infringing Product that SunFrog "removed" in October 2016. Despite "removing" the Infringing Product, SunFrog continues to use that product URL for a page of SunFrog's Website that displays dozens of shirts. SunFrog also continues to use sales-tracking URLs such as https://www.sunfrog.com/LifeStyle/**Harley-Davidson**-Biker-Brown-Guys.html?47440, which is a sales-tracking URL for an Infringing Product "removed" in January 2017 and which SunFrog currently uses for a page of SunFrog's Website that displays dozens of shirts. SunFrog's product and sales-tracking URLs are widely distributed on social media and other websites. Accordingly, if a consumer encounters and clicks on one of SunFrog's product or sale-tracking URLs for a "removed" Infringing Product on a social media page or other website, the consumer will be linked to SunFrog's Website, and may receive either a page of SunFrog's Website advertising other SunFrog products for sale or a SunFrog message inviting the consumer to "start over" (i.e., conduct a search on SunFrog's Website for products). In this way, SunFrog drives traffic to its Website using its product and sales-tracking URLs for "removed" Infringing Products, including URLs containing the H-D Marks, which SunFrog should have deactivated or disabled as a result of H-D's takedown complaints.

72.     SunFrog continues to use its image URLs for the "removed" Infringing Products. Each Infringing Product has an image URL that corresponds to a page of SunFrog's Website that displays a picture of the Infringing Product.  Despite "removing" the Infringing Products, SunFrog continues to use these pages of its Website.  Further, in addition to use on SunFrog's Website, SunFrog's image URLs for removed "Infringing Products" are used on other websites to display the pictures of the Infringing Products and to link to SunFrog's Website.  Specifically, consumers who click on such images for "removed" Infringing Products displayed on other websites will be linked to SunFrog's Website, and may receive either a page of SunFrog's Website advertising other SunFrog products for sale or a SunFrog message inviting the consumer to search for products on SunFrog's Website.  For example, the image URL https://images.sunfrogshirts.com/2016/07/06/**Harley-Dav**-Brown-_w91_-back.jpg is used for a page of SunFrog's Website that displays an Infringing Product that was "removed" in January 2017, and is used on another website to display the Infringing Product and to link to SunFrog's Website.

73.     SunFrog has continued in some cases to use pictures of  "removed" Infringing Products in search results on SunFrog's Website to "bait and switch" consumers for SunFrog's financial gain by leveraging the fame and drawing power of the H-D Marks.  Specifically, SunFrog's Website has a search box where consumers can search a term (e.g., "Harley-Davidson") and receive a page of products for sale (e.g,, shirts bearing the HARLEY-DAVIDSON mark on the product).  Consumers who click on a product picture in SunFrog's search results are usually linked to the sales page where such product can be purchased.  In some cases for "removed" Infringing Products shown in search results, SunFrog does not link to the

sales page but instead links to another page of SunFrog's Website displaying other SunFrog products for sale, thus using the H-D Marks to sell non-H-D products.

74.     SunFrog's removal of an Infringing Product does not stop SunFrog from keeping its profit from the sale of such Product.  In fact, SunFrog may earn an even higher percentage for removed products under its seller contract that allows SunFrog to keep *all* proceeds from products that are the subject of infringement complaints.

75.     SunFrog's removal of some Infringing Products does not stop SunFrog or its sellers from advertising and offering new Infringing Products bearing the same H-D Marks or even the same Infringing Designs that SunFrog previously acknowledged and "removed" in its responses to H-D's prior complaints.

76.     Despite H-D's numerous and repeated complaints and SunFrog's repeated acknowledgement of H-D's rights, SunFrog continues to this day to advertise, offer, sell, and profit from numerous Infringing Products bearing the H-D Marks on SunFrog's Website.

77.     Specifically, despite H-D's countless objections: (a) SunFrog continues to advertise and sell numerous Infringing Products bearing specific H-D Marks cited in H-D's prior objections, (b) SunFrog continues to allow the same anonymous sellers that are repeat infringers of H-D's Intellectual Property and identified in H-D's prior objections to offer numerous additional Infringing Products on SunFrog's Website, and (c) SunFrog even continues to advertise and sell numerous Infringing Products bearing designs *identical* to designs of Infringing Products that were the subject of H-D's prior objections.  Below are specific examples of each of these continuing infringing activities.

78.     SunFrog continues to advertise and sell numerous Infringing Products bearing specific H-D Marks cited in H-D's objections.  Below are representative examples of Infringing

Products that SunFrog offered in April and/or May 2017 bearing the identical H-D Marks cited in H-D's numerous prior objections.



79.     SunFrog also continues to allow the same anonymous sellers that are repeat infringers of H-D's Intellectual Property and that were identified in H-D's prior objections to offer and sell numerous Infringing Products on SunFrog's Website. For example, the sellers "BW999" and "Bomman" have been the sellers of hundreds of Infringing Products identified in

H-D's objections, and these sellers continue to this day to create and sell numerous Infringing Products on SunFrog's Website, including the representative examples shown below:



80.     SunFrog even continues to advertise and sell many Infringing Products bearing designs *identical* to designs of Infringing Products that were the subject of H-D's prior objections.  For example, on March 31, 2017, H-D objected to numerous Infringing Products, including the three Infringing Products shown below that SunFrog "removed."  Following these takedowns, dozens of new Infringing Products bearing these identical designs were posted on SunFrog's Website shortly thereafter and are still available as recently as May 15, 2017.



81.     Moreover, despite H-D submitting objections to hundreds of Infringing Products to SunFrog continuously since October 2016, SunFrog has actually expanded its product offerings bearing H-D's Intellectual Property (i.e., Infringing Products) to include leggings (in November 2016), youth t-shirts (in January 2017), and mugs (in February 2017). SunFrog also expanded its product offerings to posters and canvas prints (in March 2017). For example, after SunFrog recently expanded its product offerings to mugs, SunFrog now offers numerous mugs for sale that bear the H-D Marks, including the representative examples shown below:



82.     Defendants' continued marketing, advertisement, promotion, and sale of numerous Infringing Products demonstrate that Defendants willfully intended to trade upon the goodwill of H-D and H-D's Intellectual Property and/or recklessly disregarded H-D's rights.

83.     Defendants' actions described above are and have been intended to mislead consumers into believing that Defendants and/or their products are authorized by H-D, connected to H-D, and/or licensed, affiliated with, and/or sponsored by H-D, when in fact they are not.

84.     H-D has obtained several Infringing Products through test purchases or as a result of Customs seizures.  In each case, products were shipped from SunFrog listing its address of 1782 O'Rourke Blvd., Gaylord, MI 49735.

85.     Below is an image of an Infringing Product in the form of a t-shirt obtained in a test purchase from SunFrog.  This Infringing Product has a neck label with the SunFrog brand on the label as shown below.



SunFrog's use of its own mark on neck labels of infringing shirts bearing the H-D Marks suggests that there is a co-branding or licensing relationship between SunFrog and H-D when none exist.

## INJURY TO H-D AND THE PUBLIC

86.     Defendants' actions described above have damaged and irreparably injured and, if permitted to continue, will further damage and injure H-D, H-D's Intellectual Property, H-D's reputation and goodwill associated with those marks, H-D's reputation for high-quality products and services, and the public interest in consumers being free from confusion.

87.     Defendants' actions as described above have caused and are likely to continue to cause confusion, mistake, and deception as to the source or origin of the Infringing Products and have falsely suggested and are likely to continue to falsely suggest a sponsorship, connection, license, affiliation, or association between Defendants and/or its Infringing Products with H-D, H-D's Intellectual Property, and/or H-D's products and services.

88.     Defendants' actions described above are likely to dilute the distinctiveness of the famous HARLEY-DAVIDSON, HARLEY, H-D, HD, and Bar & Shield Logo marks, and are also likely to tarnish those famous marks, thereby injuring H-D.

89.     Defendants' products bear copies of the copyright-protected Willie G. Skull Logo. Defendants' actions as described above copied the original expression of H-D's Willie G. Skull Logo without H-D's authorization.

90.     H-D has no adequate remedy at law.

91.     Defendants knew or should have known that their activities described above constituted trademark counterfeiting, trademark infringement, trademark dilution, copyright infringement, and unfair competition, and thus Defendants acted knowingly and willfully in reckless disregard of H-D's Intellectual Property.

### FIRST CLAIM FOR RELIEF
### Trademark Counterfeiting Under Section 32(1)
### of the Lanham Act, 15 U.S.C. § 1114(1)

92.     H-D repeats and realleges each and every allegation set forth above.

38

93.     H-D owns a number of federal trademark registrations for the H-D Marks for various goods and services, many including apparel and/or mugs.

94.     Without H-D's consent, Defendants intentionally used in commerce the HARLEY-DAVIDSON, HARLEY, H-D, HD, Bar & Shield Logo, Number 1 Logo, and Willie G. Skull Logo marks and/or substantially indistinguishable variations or counterfeits thereof, as defined under 15 U.S.C. § 1116(d)(1)(B)(i), in connection with the sale, offering for sale, and/or distribution of the Infringing Products.

95.     Without H-D's consent, Defendants reproduced, counterfeited, copied, and/or colorably imitated the HARLEY-DAVIDSON, HARLEY, H-D, HD, Bar & Shield Logo, Number 1 Logo, and Willie G. Skull Logo marks and applied such reproductions, counterfeits, copies, and/or colorable imitations to labels, signs, prints, packages, wrappers, receptacles or advertisements, as defined under 15 U.S.C. § 1116(d)(1)(B)(ii), intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of the Infringing Products in a manner likely to cause confusion, or to cause mistake, or to deceive.

96.     Defendants' actions described above are likely to cause confusion, mistake, or to deceive as to the origin, sponsorship, or approval of the Infringing Products, Defendants' services, and commercial activities, and thus constitute counterfeiting of H-D's federally registered HARLEY-DAVIDSON, HARLEY, H-D, HD, Bar & Shield Logo, Number 1 Logo, and Willie G. Skull Logo marks identified above in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114.

97.     Defendants are directly, vicariously, and/or contributorily liable for the actions described above.

98.     The actions of Defendants described above have at all times relevant to this action been willful and/or knowing.

99.     As a direct and proximate result of the actions of Defendants as alleged above, H-D has been and will continue to be damaged and irreparably harmed.

100.    H-D has no adequate remedy at law.

### SECOND CLAIM FOR RELIEF
### Trademark Infringement Under Section 32(1)
### of the Lanham Act, 15 U.S.C. § 1114(1)

101.    H-D repeats and realleges each and every allegation set forth above.

102.    Defendants used and continue to use in commerce the H-D Marks and reproductions, copies, and colorable imitations thereof in connection with the offering, sale, distribution, and advertising of goods and services, which are likely to cause confusion, mistake, or deception as to the origin, sponsorship, or approval of the Infringing Products, Defendants' services, and Defendants' commercial activities, and thus constitute infringement of the H-D Marks referred to above in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114.

103.    Defendants are directly, vicariously, and/or contributorily liable for the actions described above.

104.    The actions of Defendants described above have at all times relevant to this action been willful and/or knowing.

105.    As a direct and proximate result of the actions of Defendants as alleged above, H-D has been and will continue to be damaged and irreparably harmed.

106.    H-D has no adequate remedy at law.

## THIRD CLAIM FOR RELIEF
### Trademark Infringement, False Designation
### of Origin, and Unfair Competition
### Under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A)

107.    H-D repeats and realleges each and every allegation set forth above.

108.    Defendants' actions described above are likely to cause confusion, mistake, or deception as to the origin, sponsorship, or approval of the Infringing Products and Defendants' commercial activities, and thus constitute trademark infringement, false designation of origin, and unfair competition with respect to the H-D Marks in violation of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

109.    Defendants are directly, vicariously, and/or contributorily liable for the actions described above.

110.    The actions of Defendants described above have at all times relevant to this action been willful.

111.    As a direct and proximate result of the actions of Defendants as alleged above, H-D has been and will continue to be damaged and irreparably harmed.

112.    H-D has no adequate remedy at law.

## FOURTH CLAIM FOR RELIEF
### Trademark Dilution Under Section
### 43(c) of the Lanham Act, 15 U.S.C. § 1125(c)

113.    H-D repeats and realleges each and every allegation set forth above.

114.    H-D has engaged in extensive nationwide advertising, promotion, and use of the HARLEY-DAVIDSON, HARLEY, H-D, HD, and Bar & Shield Logo marks for many years. Further, H-D has had massive sales of goods and services bearing such marks for decades.

115.    The HARLEY-DAVIDSON, HARLEY, H-D, HD, and Bar & Shield Logo marks have for many years received extensive unsolicited media attention nationwide. Such extensive

41

and frequent media attention and commercial success has had a substantial impact on the public and has long created an association in the minds of consumers between H-D and the HARLEY-DAVIDSON, HARLEY, H-D, HD, and Bar & Shield Logo marks, such that these marks are famous and were famous nationwide before Defendants commenced their unauthorized use of the those marks.

116.    Defendants' actions described above, all occurring after the HARLEY-DAVIDSON, HARLEY, H-D, HD, and Bar & Shield Logo marks became famous, are likely to cause dilution by blurring and dilution by tarnishment of the distinctive quality of those trademarks in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

117.    Defendants are directly, vicariously, and/or contributorily liable for the actions described above.

118.    The actions of Defendants described above have at all times relevant to this action been willful.

119.    As a direct and proximate result of the actions of Defendants as alleged above, H-D has been and will continue to be damaged and irreparably harmed.

120.    H-D has no adequate remedy at law.

## FIFTH CLAIM FOR RELIEF
### Copyright Infringement
### 17 U.S.C. § 101, et seq.

121.    H-D repeats and realleges each and every allegation set forth above.

122.    H-D's Willie G. Skull Logo is a wholly original work of authorship and constitutes copyrightable subject matter under the Copyright Act of 1976, 17 U.S.C. § 101 et seq.

123.    H-D is the sole owner of all right, title, and interest in and to the copyright in the Willie G. Skull Logo.

124.    H-D has complied in all respects with the Copyright Act of 1976 (17 U.S.C. § 101 et seq.) and has received from the Registrar of Copyrights Certificate of Copyright, Registration No. VA 1-987-746 for the Willie G Skull Design.  The Certificate of Registration constitutes prima facie evidence of the validity of H-D's copyright rights and the facts stated in the Certificate.

125.    H-D has never licensed, or in any other way authorized, Defendants to reproduce, cause to reproduce, prepare derivative works from, distribute, or display any portion of the Willie G. Skull Logo, which are the exclusive rights of H-D as the copyright owner.

126.    By the actions described above, Defendants have infringed and will continue to infringe H-D's copyright rights in the Willie G. Skull Logo in violation of the Copyright Act, 17 U.S.C. § 101, et seq.

127.    The actions of Defendants described above have at all times relevant to this action been willful.

128.    As a direct and proximate result of the actions of Defendants as alleged above, H-D has been and will continue to be damaged and irreparably harmed.

129.    H-D has no adequate remedy at law.

**SIXTH CLAIM FOR RELIEF**
**Trademark Infringement**
**Under Wis. Stat. § 132 et. seq.**

130.    H-D repeats and realleges each and every allegation set forth above.

131.    Defendants' actions and/or the actions of others acting on behalf of or with Defendants' authorization or knowledge making use of the HARLEY-DAVIDSON, HARLEY, H-D, HD, and the Bar & Shield Logo marks with intent to deceive as to the affiliation, connection, or association of Defendants with H-D in the conduct of their business without the authorization of H-D as set forth above constitutes statutory trademark infringement of the

Wisconsin registered HARLEY-DAVIDSON, HARLEY, H-D, HD, and the Bar & Shield Logo marks identified above in violation of Chapter 132 of the Wisconsin Statutes.

132. The actions of Defendants and/or the actions of others acting on behalf of or with Defendants' authorization or knowledge described above have at all times relevant to this action been willful.

133. Defendants are directly, vicariously, and/or contributorily liable for the actions described above.

134. The actions of Defendants described above have at all times relevant to this action been willful.

135. As a direct and proximate result of the actions of Defendants as alleged above, H-D has been and will continue to be damaged and irreparably harmed.

136. H-D has no adequate remedy at law.

**SEVENTH CLAIM FOR RELIEF**
**Common Law Trademark Infringement, Unfair**
**Competition, and Misappropriation**

137. H-D repeats and realleges each and every allegation set forth above.

138. Defendants' actions described above with respect to the H-D Marks constitute common law trademark infringement, unfair competition, and misappropriation of H-D's goodwill under the common law.

139. Defendants are directly, vicariously, and/or contributorily liable for the actions described above.

140. The actions of Defendants described above have at all times relevant to this action been willful.

141. As a direct and proximate result of the actions of Defendants as alleged above,

H-D has been and will continue to be damaged and irreparably harmed.

142.    H-D has no adequate remedy at law.


**PRAYER FOR RELIEF**

WHEREFORE, H-D prays that this Court enter judgment in its favor on each and every claim for relief set forth above and award it relief including, but not limited to, the following:

A.    An injunction preliminarily and permanently enjoining Defendants and their employees, agents, partners, officers, directors, owners, shareholders, principals, subsidiaries, related companies, affiliates, distributors, dealers, retailers, wholesalers, manufacturers, vendors including online vendors such as ISPs and offline vendors such as shipping companies, successors, assigns, and all persons in active concert or participation with any of them:

        1.    From using, displaying, and/or registering the H-D Marks in any form, including but not limited to in connection with any other wording or designs, and from using any other marks, logos, designs, designations, or indicators that are confusingly similar to any of the H-D Marks, or likely to dilute the distinctiveness of or tarnish any of the HARLEY-DAVIDSON, HARLEY, H-D, HD, and Bar & Shield Logo marks, in any unauthorized manner including, but not limited to, use on or in connection with any products in any online or offline context, including without limitation the Infringing Products, SunFrog's Website and any other online venue for its platform, any other websites or online platforms including social media and apps, promotional and advertising materials, store names, signage, and product packaging and labeling; and as or as part of any trademarks, business names, seller names on SunFrog's Website, product names on SunFrog's Website, domain names, e-mail addresses, URLs, metatags, screen

names, social media names, keywords such as advertising keywords, or any other identifiers;

       2.     From using H-D's copyrighted works or substantially similar works in any form or medium;

       3.     From representing by any means whatsoever, directly or indirectly, that Defendants or any products or services offered by Defendants, including without limitation the Infringing Products, or any activities undertaken by Defendants, emanate from H-D, or are authorized, licensed, or otherwise affiliated with or sponsored or endorsed by H-D;

       4.     From assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraphs A.1-3 above.

B.     An Order directing Defendants to destroy all products and items in their possession or under their control that bear H-D's Intellectual Property, including without limitation any Infringing Products and all items bearing Infringing Designs, and to confirm such destruction in writing to H-D, and to provide to H-D the identity and complete contact information and payee information for all persons and entities that made, produced, or advertised or sold the Infringing Products and created the Infringing Designs including, but not limited to, sellers, manufacturers, printers, shipping vendors, wholesalers, distributors, retailers and all others that assisted or enabled Defendants to make, advertise, promote, sell, distribute, and transport the Infringing Products.

C.     An Order requiring Defendants to pay H-D the cost for corrective advertising and/or to engage in corrective advertising in a manner directed by the Court.

D.      An Order directing Defendants to file with this Court and serve on H-D's attorneys, thirty (30) days after the date of entry of any injunction, a report in writing and under oath setting forth in detail the manner and form in which they have complied with the injunction and other orders issued by the Court.

E.      An Order requiring Defendants to pay statutory damages in accordance with 15 U.S.C. § 1117(c) of $2,000,000 per mark per type of product or service sold, offered for sale, or distributed by Defendants bearing marks deemed to be counterfeits of the HARLEY-DAVIDSON, HARLEY, H-D, HD, Bar & Shield Logo, Number 1 Logo, and/or Willie G. Skull Logo marks;

F.      An Order requiring Defendants to account for and pay to H-D any and all profits arising from the foregoing acts of counterfeiting, infringement, dilution, false designation of origin, and unfair competition, and an increasing of such profits for payment to H-D in accordance with 15 U.S.C. § 1117, and other applicable statutes and laws;

G.      An Order requiring Defendants to pay H-D compensatory damages in an amount as yet undetermined caused by the foregoing acts of counterfeiting, infringement, dilution, false designation of origin, unfair competition, and trebling such compensatory damages for payment to H-D in accordance with 15 U.S.C. § 1117, and other applicable statutes and laws;

H.      An Order requiring Defendants to pay statutory damages in accordance with 17 U.S.C. § 504 in an amount of $30,000 per work infringed, and an amount of $150,000 per work infringed if the Court deems that the copyright infringement was committed willfully;

I.      An Order requiring Defendants to pay H-D punitive damages in an amount as yet undetermined caused by the foregoing acts of Defendant;

J.       An Order requiring Defendants to pay H-D's costs and attorney's fees in this

action pursuant to 15 U.S.C. § 1117, 17 U.S.C. § 505, and other applicable statutes and laws; and

K.       Other relief as the Court may deem appropriate.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, H-D respectfully demands a trial by jury for all claims so

triable.

Respectfully submitted,

Dated this 19th day of May, 2017          **MICHAEL BEST & FRIEDRICH LLP**


By:_____*s/Katherine W. Schill*_____
Katherine W. Schill, SBN 1025887
100 East Wisconsin Avenue
Suite 3300
Milwaukee, WI 53202-4108
kwschill@michaelbest.com
Phone:  (414) 223-2527
Fax:  (414) 277-0656

**KELLY IP, LLP**
David M. Kelly
Stephanie H. Bald
Sabrina Y. Shyn
1919 M Street NW, Suite 610
Washington, D.C. 20036
david.kelly@kelly-ip.com
stephanie.bald@kelly-ip.com
sabrina.shyn@kelly-ip.com
Phone:  (202) 808-3570
Fax:  (202) 354-5232

**Attorneys for Plaintiffs**
**H-D U.S.A., LLC and**
**Harley-Davidson Motor Company Group, LLC**