# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| H-D U.S.A., LLC and HARLEY-DAVIDSON MOTOR COMPANY GROUP, LLC,<br><br>    Plaintiffs,<br><br>v.<br><br>SUNFROG, LLC d/b/a SUNFROG SHIRTS and JOHN DOES,<br><br>    Defendants. | Case No. 17-CV-711-JPS<br><br><br>**ORDER** |

   This is a trademark infringement case brought by Plaintiffs, collectively referred to as "Harley-Davidson," against Defendants, collectively referred to as "SunFrog." SunFrog runs an online marketplace where third-party sellers can upload designs and logos onto clothing, hats, mugs, or other items and sell them. SunFrog prints and ships the purchased items. Some of those items bore Harley-Davidson logos and word trademarks, and Plaintiffs filed this lawsuit as a result.[1] Before the Court is SunFrog's motion to dismiss the complaint for failure to state a claim upon which relief may be granted. (Docket #27). For the reasons stated below, it will be denied.

**1.  LEGAL STANDARD**

   Federal Rule of Civil Procedure 12(b) provides for dismissal of complaints which fail to state a viable claim for relief. Fed. R. Civ. P.

---

[1] The Court has enjoined SunFrog from any further infringement pending final resolution in this matter. *See H-D U.S.A., LLC v. SunFrog, LLC*, Case No. 17-CV-711-JPS, 2017 WL 3261709 (E.D. Wis. July 31, 2017).

12(b)(6). To state a claim, a complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In other words, the complaint must give "fair notice of what the. . .claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The allegations must "plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level[.]" *Kubiak v. City of Chicago*, 810 F.3d 476, 480 (7th Cir. 2016) (citation omitted). In reviewing the complaint, the Court is required to "accept as true all of the well-pleaded facts in the complaint and draw all reasonable inferences in favor of the plaintiff." *Id.* at 480–81.

**2.    RELEVANT FACTS**

The facts as pleaded can be briefly summarized. Harley-Davidson is, of course, a world-famous motorcycle manufacturer, and its word trademarks and logos are well known. Harley-Davidson prints those logos and marks on merchandise it sells alongside its automotive products. Those logos and word marks have appeared on goods sold on SunFrog's website, including clothing and other items. These are counterfeits, as none of them is sponsored by or affiliated with Harley-Davidson.

Users of SunFrog's website create and sell these counterfeit goods either by uploading their own designs featuring Harley-Davidson's marks and logos onto blank versions of the goods in question (supplied by SunFrog), or by selecting an infringing design created by another user which is stored in the SunFrog art database. SunFrog users are largely anonymous, as they are identified on the website only by self-made account names or numerical codes that do not reveal the user's identity. Once a buyer actually purchases one of the user's infringing designs, SunFrog

prints the item using an automated printer and then ships it. SunFrog also keeps the majority of the profit from the sales.

SunFrog advertises these products on the Internet and through social media outlets. Further, it encourages users to track sales using its sales-tracking tools and to advertise their goods on social media. SunFrog persists in promoting and selling these goods despite receiving numerous takedown requests and other notifications from Harley-Davidson that infringement is occurring. Indeed, "[f]rom at least as early as October 2016 to the present, H-D has submitted more than 70 complaints to SunFrog that: (a) notified SunFrog of H-D's rights in the H-D Marks, and (b) reported and objected to more than 800 Infringing Products that have been advertised, promoted, offered, and/or sold on SunFrog's Website in violation of H-D's rights." (Docket #1 ¶ 68). Moreover, even when SunFrog would try to control infringement by users, its attempts were halfhearted: it would take a long time for infringing designs to be taken down in response to requests for the same, those same designs would crop up again soon after because there was no system in place to curb infringement at the design stage, and repeat infringers would pop up again and again with few or no repercussions.

Harley-Davidson claims that "SunFrog is thus not a passive participant in the business conducted by sellers on and through SunFrog's Website." *Id.* ¶ 64. According to Harley-Davidson, "[t]his is not a situation where SunFrog's only role is to provide sellers with access to an online marketplace to sell their products and everything is done by the sellers. Rather, SunFrog is an active partner of the sellers and directly involved in the sellers' business in many ways, all for SunFrog's financial gain[.]" *Id.*

The complaint recites claims for: (1) trademark counterfeiting under 15 U.S.C. § 1114(1); (2) trademark infringement under 15 U.S.C. § 1114(1); (3) trademark infringement, false designation of origin, and unfair competition under 15 U.S.C. § 1125(a)(1)(A); (4) trademark dilution under 15 U.S.C. § 1125(c); (5) copyright infringement under 17 U.S.C. § 101 *et seq.*; (6) trademark infringement under Wis. Stat. § 132 *et seq.*; and (7) common law trademark infringement, unfair competition, and misappropriation. *See* (Docket #1 at 38–45).

3. **ANALYSIS**

SunFrog does not contest that its users' conduct constitutes infringement of Harley-Davidson's intellectual property rights. Rather, its motion focuses on why it should not be responsible for this rampant infringement. First, says SunFrog, it does not itself create infringing designs. (Docket #28 at 6). Second, it cannot be expected to review the millions of designs presently on its website and the thousands more added each day. *Id.* Third, it has made efforts to curb infringement, including requiring users to check a box stating that they are not violating the intellectual property rights of others when they submit a design. *Id.* SunFrog claims that it will terminate users who renege on this promise. *Id.* Further, SunFrog claims that in light of its explosive growth and the concerns over potential infringement, it is all the time developing and refining tools that can be used to search its database for infringing goods and remove them, including responding to takedown notices, permitting rights holders like Harley-Davidson to directly search its design databases to identify problematic offerings, and diverting profits from infringing goods to the rights holders. *Id.* at 6–7.

SunFrog raises four grounds for dismissal, none of which has merit. First, it claims that Harley-Davidson has not alleged facts that plausibly support their seven claims for relief. *Id.* at 7–8. The problem with the argument, however, is that SunFrog does no more than state this conclusion. *See id.* SunFrog cites a host of cases about the plausibility pleading regime and its application in intellectual property cases, but omits the critical link between those legal principles and any of the facts alleged in the complaint. Why does SunFrog think that Harley-Davidson's complaint—which is lengthy, detailed, and specific—is so conclusory as to be worthy of dismissal? It does not say. To the extent that SunFrog believes that the burden here shifted to Harley-Davidson once it invoked the word "plausibility," *see* (Docket #37 at 4), it is mistaken, *Yeksigian v. Nappi*, 900 F.2d 101, 104 (7th Cir. 1990); *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991). The Court is not required to develop SunFrog's arguments on its behalf, and so the point need not be addressed further. *See Hardrick v. City of Bolingbrook*, 522 F.3d 758, 762 (7th Cir. 2008); *Spath v. Hayes Wheels Int'l–Ind., Inc.*, 211 F.3d 392, 397 (7th Cir. 2000) ("[I]t is not this court's responsibility to research and construct the parties' arguments.") (quotation omitted).[2]

---

[2]Only in its reply did SunFrog find it prudent to mount some specific attacks against Harley-Davidson's claims. *See* (Docket #37 at 2–14). Those arguments are extensive and rely in large measure on a seminal case from the Second Circuit, *Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F.3d 93, 102 (2d Cir. 2010), as well as authorities defining the scope of contributory trademark and copyright infringement, *see* (Docket #37 at 11–16). They deserve only passing mention, however, since raising them for the first time in a reply means the arguments are waived. *Studio & Partners v. KI*, No. 06–C–0628, 2008 WL 426496, at *6 (E.D. Wis., Feb. 14, 2008) ("[I]t should go without saying that a reply brief [] is hardly the correct vehicle for raising new arguments[.]") (citing *TAS Distrib. Co., Inc. v. Cummins Engine Co., Inc.*, 491 F.3d 625, 630–31 (7th Cir. 2007)); *James v. Sheahan*, 137

Second, SunFrog contends that, as a mere printer of goods bearing Harley-Davidson's marks, it has not used the marks in commerce as required to sustain a claim under federal or Wisconsin trademark law. *Id.* at 8–9. As the Court observed in its ruling on Harley-Davidson's motion for preliminary injunction, SunFrog cites no case that colorably supports its position. *H-D U.S.A., LLC v. SunFrog, LLC*, Case No. 17-CV-711-JPS, 2017 WL 3261709, at *2 n.1 (E.D. Wis. July 31, 2017). Instead, SunFrog directs the

---

F.3d 1003, 1008 (7th Cir. 1998) ("Arguments raised for the first time in a reply brief are waived."). This tactic is proscribed because it deprives the non-movant of the ability to challenge arguments that could have been made in the opening brief, and deprives the Court of the benefit of each side's views on a given argument.

Additionally, SunFrog's contention that Harley-Davidson's claims are premised on speculation is, in the main, just a repackaging of its other arguments pertaining to use in commerce, innocent printers, and the like. Those matters are discussed further herein, so the Court need not separately address them here. Moreover, to the extent SunFrog wants to raise its own facts to defeat Harley-Davidson's, that must await summary judgment. *See Kubiak*, 810 F.3d at 480–81.

Finally, for reasons similar to those given below in relation to *Henderson v. eBay, Inc.*, 165 F. Supp. 2d 1082, 1094 (C.D. Cal. 2001), the Court does not find that the Second Circuit's *Tiffany* decision is apposite. There, eBay claimed it never saw or inspected allegedly infringing goods offered for sale through its online marketplace, nor could it know whether certain goods offered were actual counterfeits rather than merely resales. *Tiffany*, 600 F.3d at 102. Here, however, SunFrog operates the very printers that print infringing goods, and it does not appear to offer resale of goods. Its claim to innocence is far more tenuous than eBay's. Indeed, eBay would have been hard-pressed to defend itself from Tiffany if eBay not only provided a platform for the sale of counterfeit lamps but also ran the leaded-glass shop that made them. *See also Tre Milano, LLC v. Amazon.Com, Inc.*, B234753, 2012 WL 3594380, at *11 (Cal. Ct. App. Aug. 22, 2012) (absolving Amazon in hosting sellers of counterfeit goods "because Amazon is a service provider, not the seller. Amazon did not currently have any [infringing goods] in its own inventory; those it sold belonged to third party sellers. That Amazon provided the product description and handled the payments did not make it a direct seller of the products."); *Milo & Gabby, LLC v. Amazon.com, Inc.*, No. C13–1932RSM, 2015 WL 4394673, at *8–9 (W.D. Wash. July 16, 2015). Consequently, no matter how robust may be SunFrog's screening and takedown procedures, they do not compel dismissal of the complaint at this early stage.

Court to one 20-year-old case in which Harley-Davidson chose not to sue a printer of infringing goods and implies that such a claim must not be available under the Lanham Act. (Docket #28 at 8–9) (citing *Harley-Davidson, Inc. v. Selectra Int'l Designs, Ltd.*, 855 F. Supp. 275, 278 (E.D. Wis. 1994)).

As it explained in its earlier decision, the Court is not convinced, and the reason for this is related to another of SunFrog's arguments: that it cannot be liable for monetary damages because it is an "innocent infringer" as provided in 15 U.S.C. § 1114(2)(A). (Docket #28 at 11–13). That Section provides:

> Where an infringer or violator is engaged solely in the business of printing the mark or violating matter for others and establishes that he or she was an innocent infringer or innocent violator, the owner of the right infringed or person bringing the action under section 1125(a) of this title shall be entitled as against such infringer or violator only to an injunction against future printing.

15 U.S.C. § 1114(2)(A). Section 1114(2)(A) contemplates that injunctive relief is available to prevent future printing of infringing goods, meaning that Congress intended that an infringement action could lie directly against a printer. Indeed, because this provision supplies a defense to monetary damages only, the unavoidable conclusion is that even an innocent printer of infringing goods may be liable for infringement and can be enjoined from future infringement. *Nat'l Bus. Forms & Printing, Inc. v. Ford Motor Co.*, 671 F.3d 526, 536 n.7 (5th Cir. 2012); *Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980, 985 (9th Cir. 1999); *Barrios v. Am. Thermal Instruments, Inc.*, 712 F. Supp. 611, 620 (S.D. Ohio 1988); *Gianni Versace SPA v. Awada*, Case No. CV 03-3254 GPS(RNBx), 2008 WL 11338774, at *1 (C.D. Cal. Mar. 25,

2008). In this case, Harley-Davidson has alleged that SunFrog uses its marks in commerce by publishing them on its website and in advertising and by printing the marks on goods and shipping them. (Docket #34 at 9). No more is required at this juncture.

This conclusion dovetails into SunFrog's argument that it should be protected from monetary damages on the trademark claims as an innocent infringer. (Docket #28 at 11–13). Here, SunFrog's point seems to be that because its automated printers print goods at users' requests, without any involvement from SunFrog employees directly, it is not aware of infringement until such activity is brought to its attention later. *Id.* at 12.

This argument flies in the face of the facts alleged. Harley-Davidson has asserted that SunFrog knows that its users infringe others' intellectual property rights, that it promotes this infringement throughout Internet advertising, that it facilitates the infringement by printing and shipping the goods, and that it does this to generate profit from the sales. It thus appears that SunFrog does far more than a mere on-demand printer. *See K&N Eng'g, Inc. v. Bulat*, 259 F. App'x 994, 995 (9th Cir. 2007) (because the defendants advertised and sold infringing goods rather than advertising and selling printing services, "they were not engaged solely in the business of printing the mark or violating matter for others, and thus were [not] innocent infringers").

Drawing inferences from the facts in Harley-Davidson's favor, it is easily said that whatever the size or scope of SunFrog's business, it can be charged with knowing what goods come off of printers that it owns and operates. If the statute's reference to "innocence" means, as SunFrog contends, that only knowing or reckless infringement is actionable, Harley-Davidson's allegations suffice. *See World Wrestling Fed'n, Inc. v. Posters, Inc.*,

No. 99 C 1806, 2000 WL 1409831, at *3 (N.D. Ill. Sept. 26, 2000).[3] At a minimum, failing to police one's own manufacturing process can be viewed as reckless disregard for whether infringement is occurring. *See id.*

Put differently, SunFrog equates itself with a vending machine, producing products at a customer's order without oversight. (Docket #28 at 13). But the point of this case is that SunFrog in fact operates like a self-aware vending machine, with the ongoing ability to monitor the products its users order (and that it creates) and to know that those products are infringing. This is enough to pass the pleading phase. The Court will not dismiss any of Harley-Davidson's claims for monetary damages.[4]

Finally, SunFrog claims that it is protected from Harley-Davidson's copyright claim by the safe-harbor provisions of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512. SunFrog asserts that it is an

---

[3] Harley-Davidson, relying on a more recent case from the Fifth Circuit, says that the standard for assessing innocence should not be actual malice but the objective reasonableness of the accused infringer's actions. (Docket #34 at 15); *Dial One of the Mid-S., Inc. v. BellSouth Telecomm., Inc.*, 269 F.3d 523, 525–27 (5th Cir. 2001). Applying this much lower standard would further undermine what appears to be SunFrog's "ostrich" defense in this case. *See* 4 McCarthy on Trademarks and Unfair Competition § 25:29 (4th ed.). The Court need not yet decide who is right on this point, as SunFrog's argument fails even if the Court applied the actual malice standard.

[4] This sort of argument seems to encapsulate SunFrog's whole approach to this case: that its business model cannot be sustained if it is required to monitor and control infringement in the way Harley-Davidson requests. Certainly, the measures Harley-Davidson seeks to impose may detract from SunFrog's bottom line. But the Court cannot tarry over such concerns, as its task is to determine whether SunFrog has infringed others' intellectual property rights. Whether SunFrog can practically and profitably adapt its business model to avoid infringement is a matter entirely committed to SunFrog. *See Ohio State Univ. v. Skreened Ltd.*, 16 F. Supp. 3d 905, 916–18 (S.D. Ohio 2014) ("Selling knockoffs is selling knockoffs, regardless of who suggested you sell them, regardless of how many other infringing products you decide not to sell, and regardless of how much of a hassle it is to comply with the law.").

Internet service provider ("ISP") and that, as such, it is not liable for copyright infringement

> by 'referring or linking users to an online location containing infringing material' if it meets certain conditions—it doesn't know the material is infringing, it isn't aware of facts that would make the infringement apparent, upon learning such facts it acts expeditiously to remove or disable access to the infringing material, it doesn't receive a financial benefit directly attributable to the infringing activity, 17 U.S.C. § 512(d), and it terminates repeat infringers.

*Flava Works, Inc. v. Gunter*, 689 F.3d 754, 758 (7th Cir. 2012) (quoting 17 U.S.C. § 512(i)(1)(A)); *see also In re Aimster Copyright Litig.*, 252 F. Supp. 2d 634, 661 (N.D. Ill. 2002), *aff'd*, 334 F.3d 643 (7th Cir. 2003). According to SunFrog, it is not responsible for its users' copyright infringement because it does not generate those designs and it takes them down when notified. (Docket #28 at 11).

This argument does not suffice to warrant dismissal of the copyright claim. The DMCA safe-harbor provisions represent an affirmative defense to be pleaded and proved by SunFrog. *Mavrix Photographs, LLC v. LiveJournal, Inc.*, 853 F.3d 1020, 1027 (9th Cir. 2017). Consequently, the argument can only succeed on a motion to dismiss "if the defense appears on the face of the complaint," meaning that "the complaint itself must establish the facts necessary to sustain defendant's defense." *BWP Media USA Inc. v. Hollywood Fan Sites, LLC*, 69 F. Supp. 3d 342, 358 (S.D.N.Y. 2014). As the Seventh Circuit has explained, a plaintiff need not anticipate defenses at all; indeed, "[o]nly when the plaintiff pleads itself out of court— that is, admits all the ingredients of an impenetrable defense—may a complaint that otherwise states a claim be dismissed under Rule 12(b)(6)." *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004).

SunFrog has not met its burden to establish that Harley-Davidson pled itself out of court on the DMCA safe harbor defense. Indeed, Harley-Davidson's allegations, liberally construed as required by the standard of review, refute each element of that defense. On the face of Harley-Davidson's complaint, it appears that SunFrog actually knows that its users create and that it prints and sells infringing material. SunFrog continues to permit this to occur because it is profitable. Further, SunFrog drags its feet in responding to takedown notices, and its takedown efforts have little lasting effect.

Finally, and perhaps most importantly, SunFrog has the ability to control the infringing activity. Because SunFrog indisputably receives a direct financial benefit from that activity, it must demonstrate that it does not have the right or ability to control the infringing activity to fall within the safe harbor. 17 U.S.C. § 512(d)(2). While SunFrog might complain that it lacks the practical means to monitor all design creation and printing for infringement, it built and operates both the platform and the production line in which infringement occurs.

This case is thus unlike *Henderson v. eBay, Inc.*, 165 F. Supp. 2d 1082, 1094 (C.D. Cal. 2001), in which eBay sought protection under the DMCA safe harbor. The court found that eBay's ability to control infringement was not established merely because it could remove infringing listings after receiving a takedown notice. *Id.* Critical to the court's analysis was the fact that eBay had no involvement in consummating the transaction involving the infringing goods, other than providing a platform for the buyer and seller to interact. *Id.* The court observed that

> [u]nlike a traditional auction house, eBay is not actively involved in the listing, bidding, sale and delivery of any item

> offered for sale on its website. eBay's evidence shows that it does not have any control over the allegedly infringing items—the pirated films. The evidence also shows that eBay never has possession of, or opportunity to inspect, such items because such items are only in the possession of the seller. When auctions end, eBay's system automatically sends an email to the high bidder and the seller identifying each other as such. After that, all arrangements to consummate the transaction are made directly between the buyer and seller. eBay has no involvement in the final exchange and generally has no knowledge whether a sale is actually completed (*i.e.*, whether payment exchanges hands and the goods are delivered). If an item is sold, it passes directly from the seller to the buyer without eBay's involvement. eBay makes money through the collection of an "insertion fee" for each listing and a "final value fee" based on a percentage of the highest bid amount at the end of the auction.

*Id.* SunFrog's business model is quite unlike eBay's: SunFrog promotes infringing designs created by its users, it has possession of and an opportunity to inspect the goods it prints before shipment, and it knows that purchases of infringing goods are consummated because it actually prints and ships the goods to the buyer. In contrast to eBay, SunFrog is intimately—indeed indispensably—involved in transactions involving infringing goods. Regardless of the ease of doing so, then, SunFrog has "some ability to limit or filter copyrighted material." (Docket #28 at 11) (citing *MGM, Inc. v. Grockster*, 545 U.S. 913, 926 (2005)). As a result, the Court finds that SunFrog has not sustained its claim to the DMCA safe harbor, at least not on the allegations in the complaint.

4.  **CONCLUSION**

For the reasons stated above, the Court finds that SunFrog's motion to dismiss is wholly without merit. As such, it will be denied.

Accordingly,

**IT IS ORDERED** that Defendant's motion to dismiss (Docket #27) be and the same is hereby **DENIED**.

Dated at Milwaukee, Wisconsin, this 4th day of October, 2017.

BY THE COURT:

J. P. Stadtmueller
U.S. District Judge