**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION**

---

**H-D U.S.A., LLC and HARLEY-
DAVIDSON MOTOR COMPANY
GROUP, LLC,**

              Plaintiffs,

    vs.

**SUNFROG, LLC d/b/a SUNFROG
SHIRTS and JOHN DOES,**

              Defendants.

Case No. 2:17-cv-00711


**JURY TRIAL REQUESTED**

---

**MEMORANDUM IN SUPPORT FOR
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

       Plaintiffs H-D U.S.A., LLC and Harley-Davidson Motor Company Group, LLC

(collectively, "H-D") submit this Memorandum in support of their Motion for Partial Summary

Judgment against Defendant SunFrog, LLC d/b/a SunFrog Shirts ("SunFrog") on their claims of

trademark counterfeiting, infringement, false designation of origin, and dilution claims under

federal, state, and/or common law.  H-D also submits a Statement of Proposed Material Facts

("SPMF") pursuant to Civ. L.R. 56.2(a) and the declarations of Adraea Brown of H-D; Leslie

Gutowski and Sabrina Shyn of Kelly IP; and Katherine Schill of Michael Best & Friedrich.

References to the SPMF are cited as ("SPMF ¶ [no.]").

**I.**      **INTRODUCTION**

       SunFrog's marketing, offering for sale, selling, printing, and shipping of products bearing

H-D's trademarks HARLEY-DAVIDSON, HARLEY, H-D, HD, FAT BOY, and SPORTSTER;

and its Bar & Shield, Willie G. Skull, and Number 1 logos (collectively, the "H-D Marks") establish an open-and-shut case of trademark counterfeiting, trademark infringement, and trademark dilution, among other claims. Indeed, in granting H-D's Motion for Preliminary Injunction (the "PI Order"), this Court stated that this is "a fairly straightforward case of counterfeiting." (Dkt. 33, p. 3.)

SunFrog is in the business of marketing, promoting, advertising, offering to sell, selling, printing, and shipping products, including apparel, mugs, and hats, on SunFrog's websites at SUNFROG.COM and SUNFROGSHIRTS.COM (collectively, "SunFrog's Website"), many of which have displayed one or more of the H-D Marks (the "Infringing Products"). SunFrog has also made available, licensed, and/or provided free of charge to sellers on SunFrog's Website numerous logos and images containing the H-D Marks (the "Infringing Designs") that could be immediately applied to numerous blank products of various styles, colors, and sizes, and offered for sale on SunFrog's Website with just a few keystrokes. When consumers purchased Infringing Products on SunFrog's Website, SunFrog handled the payment transaction, then printed and shipped, or arranged to have printed and shipped, such products to the purchasers. SunFrog even put the SunFrog name on some of the Infringing Products to create the impression that it had an official "co-branding" relationship with H-D.

H-D attempted to address the trademark violations outside of the courts numerous times by using SunFrog's published takedown complaint procedure for trademark violations. From October 2016 to May 2017, H-D submitted more than 70 complaints to SunFrog that: (a) notified SunFrog of H-D's rights in the H-D Marks, and (b) reported and objected to well over 800 Infringing Products that were advertised, promoted, offered, and/or sold on SunFrog's Website. The vast majority of the Infringing Products displayed one or more marks identical or virtually

identical to the H-D Marks. Despite H-D's numerous and repeated complaints, however, SunFrog continued to advertise, promote, offer for sale, and sell on SunFrog's Website numerous Infringing Products; SunFrog continued to make available an increasing number of Infringing Designs available for any SunFrog seller to apply to blank products and sell on SunFrog's Website; and SunFrog even expanded its infringement and counterfeiting to new types of Infringing Products. SunFrog not only allowed, but encouraged these trademark violations by instructing its sellers on ways to market and advertise Infringing Products on social media to maximize public exposure of the Infringing Products, resulting in increased sales for sellers and increased profits for SunFrog.

Throughout the Preliminary Injunction phase of this case, moreover, SunFrog continued its extensive infringement and counterfeiting of the H-D Marks – despite representing to this Court multiple times that it had ceased all such violations in an attempt to avoid entry of a preliminary injunction. For example, on June 21, 2017, SunFrog filed a brief in opposition to H-D's PI Motion arguing that H-D's preliminary injunction request was moot because SunFrog "voluntarily adopted measures" to cease violating the H-D Marks such that SunFrog had "fully resolved" H-D's concerns. But H-D, in its Reply Brief filed on July 5, 2017, showed that the PI was not moot because SunFrog was continuing its infringement and counterfeiting of the H-D Marks in numerous ways. SunFrog again argued that it had ceased its infringement and counterfeiting of the H-D Marks at the July 14, 2017 scheduling conference before this Court, and H-D again showed that SunFrog was still infringing and counterfeiting the H-D Marks in numerous ways.

On July 31, 2017, this Court granted in large part H-D's Motion for Preliminary Injunction. (Dkt. 33.) But SunFrog, consistent with its willful disregard of H-D's rights before

the PI Order, failed to comply with the PI Order for weeks after its issuance. H-D sent emails to SunFrog's counsel on August 7, 11, 15 and 18, 2017; October 25, 2017; and November 15, 2017 documenting and detailing SunFrog's numerous violations of the PI Order. Significantly, H-D easily and quickly discovered and identified these violations, like it did with SunFrog's earlier violations, by using publicly available searches of SunFrog's Website, Facebook, and Google. SunFrog could have easily and quickly done the same searches to prevent those violations.

SunFrog's actions infringe all of the H-D Marks, constitute trademark counterfeiting of the H-D Marks with federal trademark registrations covering certain types of apparel, mugs, and/or hats, and constitute dilution of H-D's famous HARLEY-DAVIDSON, HARLEY, H-D, HD, and Bar & Shield logo marks, among other violations.[1] And SunFrog's infringement, counterfeiting, and dilution of the H-D Marks was at all times, and still is, willful.

H-D is entitled to summary judgment on its trademark counterfeiting, infringement, false designation of origin, unfair competition, and dilution claims. There is no genuine dispute of material fact that the H-D Marks are protectable and SunFrog's use of marks that are identical or materially indistinguishable violates the H-D Marks in various ways. H-D is also entitled to a permanent injunction to prevent irreparable harm to H-D, the H-D Marks, and the public, and to maximum statutory damages of $2,000,000 per mark per type of good for at least 64 instances of willful trademark counterfeiting by SunFrog for a total of $128,000,000.

---

[1] H-D has asserted various claims in its complaint. (Dkt. 1, Compl., Claims 1-7). For purposes of this motion, H-D moves on its trademark infringement, counterfeiting, false designation of origin, and dilution claims (Counts 1-4 and 6-7), leaving only its claim of copyright infringement (Count 5).

## II.     ARGUMENT

### A.     Summary Judgment Legal Standard

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 676–77 (7th Cir. 2001).  Factual disputes are "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmovant," and are "material" only when "they might affect the outcome of the suit under the governing law."  *CAE, Inc.*, 267 F.3d at 676–77.

The Court must "construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party."  *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491–92 (7th Cir. 2000).  A party opposing summary judgment, however, bears the burden to respond, not simply by resting on its own pleading but by "set[ting] out specific facts showing a genuine issue for trial."  *See* Fed. R. Civ. P. 56(e).  The nonmovant must create more than mere doubt as to the material facts and will not prevail by relying on a mere scintilla of evidence to support its position.  *CAE, Inc.*, 267 F.3d at 677; *see also, Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010) ("We often call summary judgment the 'put up or shut up' moment in litigation, by which we mean that the non-moving party is required to marshal and present the court with the evidence she contends will prove her case. And by evidence, we mean evidence on which a reasonable jury could rely." (citations  omitted)). "When the record, taken as a whole, could not lead a rational jury to find for the non-moving party, there is no genuine issue and therefore no reason to go to trial."  *C & N Corp. v. Kane*, 953

F. Supp. 2d 903, 908 (E.D. Wis. 2013) *aff'd sub nom*, *C & N Corp. v. Kane*, 756 F.3d 1024 (7th Cir. 2014).

### B. H-D is Entitled to Judgment As a Matter of Law on its Trademark Counterfeiting, Infringement, and False Designation of Origin Claims

Under the Lanham Act, trademark infringement involves the use of a "reproduction, counterfeit, copy, or colorable imitation" of a registered mark in such a way as "is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1). For an infringement to also constitute counterfeiting, the mark must be "counterfeit." A "counterfeit mark" is defined as "a counterfeit of a mark that is registered on the principal register in the United States Patent and Trademark Office" or "a spurious designation that is identical with, or substantially indistinguishable from" a registered mark for such goods or services sold, offered for sale, or distributed by the defendant. 15 U.S.C. § 1116. Section 43(a), which provides a federal cause of action for infringement of unregistered trademarks, prohibits the use of a mark that "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." 15 U.S.C. § 1125(a)(1)(A). The test under Section 43(a) is the same as for trademark infringement, i.e., likelihood of confusion. *See, e.g.*, *Smith Fiberglass Prods., Inc. v. Ameron, Inc.*, 7 F.3d 1327, 1329 (7th Cir. 1993).[2]

---

[2] Claims for trademark infringement and unfair competition under state law are also governed by the same likelihood-of-confusion test. *See Nat'l Football League Properties, Inc. v. ProStyle, Inc.*, 16 F. Supp. 2d 1012, 1014–15 (E.D. Wis. 1998); *Patterson v. TNA Entertainment, LLC*, No. 04-C-0192, 2006 WL 3091136, at *21 (E.D. Wis. Oct. 27, 2006). Further, claims for trademark infringement are identical under statutory and common law, *Foamation, Inc. v. Wedeward Enterprises, Inc.*, 970 F. Supp. 676, 689 (E.D. Wis. 1997), as are claims for unfair competition, *Echo Travel, Inc. v. Travel Associates, Inc.*, 870 F.2d 1264, 1266 (7th Cir. 1989); *Thermal Design, Inc. v. Am. Soc'y of Heating Refrigerating & Air-Conditioning Engineers, Inc.*, No. 07- C-765, 2008 WL 1902010, at *8 (E.D. Wis. Apr. 25, 2008). Accordingly, because H-D

To prevail on its claims for trademark infringement and false designation of origin (Counts 2 and 3), H-D must show that: (1) it owns a protectable trademark, and (2) SunFrog used H-D's trademark in a manner that is likely to cause consumer confusion. *See C & N Corp.*, 953 F. Supp. 2d at 912. To establish trademark counterfeiting (Count 1), H-D must show elements (1) and (2) above, and that SunFrog used a "counterfeit" of a mark registered on the Principal Register. *Gen. Elec. Co. v. Speicher*, 877 F.2d 531, 533–34 (7th Cir. 1989). A "counterfeit mark" is defined in relevant part as "a counterfeit of a mark that is registered on the principal register in the United States Patent and Trademark Office for such goods or services *sold, offered for sale, or distributed* and that is in use, whether or not the person against whom relief is sought knew such mark was so registered." 15 U.S.C. § 1116(d)(1)(B)(i) (emphasis added). Accordingly, SunFrog's acts of offering the Infringing Products for sale on its Website constitute counterfeiting even if there were no sales of some of the Infringing Products. As detailed below, H-D satisfies all of these elements of its infringement, false designation of origin, and counterfeiting claims.

It is undisputed that H-D owns valid and protectable trademark rights in each of the H-D Marks. H-D owns federal trademark registrations for each of the H-D Marks, except HD, for motorcycles. (SPMF ¶¶ 20-21.) H-D also owns federal registrations for the marks HARLEY-DAVIDSON, HARLEY, HD, H-D, Bar & Shield Logo, Willie G. Skull Logo, and Number 1 Logo for apparel; for the marks HARLEY-DAVIDSON, Bar & Shield Logo, Willie G. Skull Logo, and Number 1 Logo for mugs; and for the marks HARLEY-DAVIDSON, H-D, HD, Bar & Shield Logo, Willie G. Skull Logo, and Number 1 Logo covering hats. (*Id*. ¶ 20.) All of these registrations except one are "incontestable" (*Id*.), which constitutes conclusive evidence of H-D's

is likely to prevail on its federal claims in Counts 2 and 3 of its Complaint, it also is likely to prevail on its state and common law claims asserted in Counts 6 and 7.

ownership of and exclusive rights to use such marks in commerce for the goods recited in the registration, 15 U.S.C. § 1115(b), and the other registration (Reg. No. 4465604) is prima facie evidence that the registered mark is valid.  15 U.S.C. §1115(a).  In addition, H-D has common law rights in all of the H-D Marks for apparel, mugs, hats, and other goods based on its use of those marks for such goods for many years. (*Id*. ¶ 10.)

Turning to likelihood of confusion, H-D has established that SunFrog has used marks that are identical to or substantially indistinguishable from the H-D Marks for apparel products, hats, and mugs. (SPMF ¶¶ 54-58.)  This counterfeiting creates a presumption of likelihood of confusion because a defendant's products are likely to confuse consumers when the marks on those products are identical to or closely resemble a plaintiff's marks.  *See Microsoft Corp. v. Rechanik*, 249 Fed. Appx. 476, 479 (7th Cir. 2007) (unpublished); *Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145, 148 (4th Cir. 1987) ("Where . . . one produces counterfeit goods in an apparent attempt to capitalize upon the popularity of, and demand for, another's product, there is a presumption of a likelihood of confusion"); *Coach, Inc. v. Treasure Box, Inc.*, No. 3:11 CV 468, 2013 WL 2402922, at *4 (N.D. Ind. May 31, 2013) (finding that where a defendant used the same trademark on the very type of goods the trademark owner sells, the defendant has 'intentionally copie[d] a trademark design with the intent to derive a benefit from the reputation of another' and a likelihood of confusion can be presumed") (collecting cases holding that in counterfeit cases, a likelihood of confusion can be presumed).  Moreover, this Court in the PI Order found: "Because SunFrog sells numerous products bearing marks identical to or materially indistinguishable from Harley-Davidson's registered (and largely incontestable) marks, Harley-Davidson has established a likelihood that consumers, viewing SunFrog's products in the marketplace, would be confused as to their source, affiliation, or sponsorship."  (Dkt. 33, p. 2.)

Even if H-D had to establish a likelihood of confusion using the traditional multi-factor test,[3] a likelihood of confusion is "self-evident" where, as here, the marks and products are identical. *Third Educ. Group, Inc. v. Phelps*, 675 F. Supp. 2d 916, 924 (E.D. Wis. 2009). In any event, *all* seven factors strongly favor H-D as: (1) the parties' marks are identical or materially indistinguishable; (2) the parties offer identical products; (3) both parties sell such products to the general public, including online; (4) even sophisticated consumers cannot distinguish the identically-branded products; (5) the H-D Marks are strong and famous; (6) actual confusion is presumed where the marks and products are identical; and (7) SunFrog's bad-faith intent to trade on H-D's goodwill and palm off their own products as H-D's is clear based on its slavish copying of the H-D Marks and its willful disregard of the H-D Marks by ignoring H-D's numerous objections to SunFrog's infringement and counterfeiting of the H-D Marks.[4]

**C.      H-D is Entitled to Judgment As a Matter of Law on its Dilution Claim**

To prevail on its dilution claim (Count 4), H-D must show that: (1) the HARLEY-DAVIDSON, HARLEY, H-D, HD, and Bar & Shield logo marks ("H-D's Famous Marks") are distinctive and famous; (2) SunFrog's promotion and sale of the Infringing Products began after H-D's Famous Marks became famous; and (3) the Infringing Products are likely to dilute the distinctiveness of H-D's Famous Marks and their ability to identify and distinguish H-D's goods and services. 15 U.S.C. § 1125(c)(2)(B); *H-D USA LLC v. Mayo*, No. 14-CV-654-JPS, 2016 WL

---

[3] The Seventh Circuit considers the following factors to determine whether consumers are likely to be confused: (1) the similarity between the marks in appearance and suggestion; (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree and care likely to be exercised by consumers; (5) the strength of the plaintiff's mark; (6) any actual confusion; and (7) the intent of the defendant to "palm off" his product as that of the plaintiffs. *Ty, Inc. v. Jones Groups, Inc.*, 237 F.3d 891, 897 (7th Cir. 2001).

[4] The fact that SunFrog's counterfeit products are comparably priced to H-D's genuine authorized products (SPMF ¶¶ 13, 41) further increases the likelihood of confusion.

7839144, at *2 (E.D. Wis. June 10, 2016), judgment entered, No. 14-CV-654-JPS, 2016 WL 7839145 (E.D. Wis. Sept. 8, 2016). As shown below, H-D satisfies each element of this test.

### 1. H-D's Famous Marks Are Famous

To be famous, a mark must be "widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A). Courts may consider all relevant factors in determining fame, including: (1) the duration, extent, and geographic reach of advertising and publicity of the mark; (2) the amount, volume, and geographic extent of sales of goods and services offered under the mark; (3) the extent of actual recognition of the mark; and (4) whether the mark is registered with the U.S. Patent and Trademark Office. 15 U.S.C. § 1125(c)(2)(A).

Applying these factors here, H-D's Famous Marks are unquestionably distinctive and famous. First, H-D's Famous Marks have been continuously and widely used throughout the U.S. for decades and some for over 100 years. (SPMF ¶¶ 8, 10.) Second, H-D and its dealers and licensees have sold many billions of dollars of products and services under H-D's Famous Marks, and spent many millions of dollars in extensively promoting those marks. (*Id.* ¶ 18,23.) Third, H-D's Famous Marks have attracted intense unsolicited media attention. (*Id.* ¶ 23.) Fourth, H-D owns numerous federal trademark registrations for H-D's Famous Marks covering an extensive variety of products and services. (*Id.* ¶¶ 20-21.) Most of these registrations, including those covering apparel, are incontestable (*Id.*) and thus constitute conclusive evidence of their validity and H-D's ownership of those marks. In fact, numerous courts, including this Court, and the Trademark Trial and Appeal Board of the United States Patent and Trademark Office already have found that H-D's HARLEY-DAVIDSON and Bar & Shield logo marks were famous marks. (*Id.* ¶ 26; *see* Order Denying SF's MTD, Dkt. 40, p. 2.) Accordingly, H-D's Famous Marks are distinctive and famous marks.

## 2. The H-D Marks Became Famous before SunFrog Began Offering the Infringing Products

SunFrog began promoting, advertising, offering for sale, and selling the Infringing Products in October 2016, long after H-D's Famous Marks became famous. (SPMF ¶ 54.)

## 3. SunFrog's Infringing Products are Likely to Dilute the H-D Marks

Courts recognize two types of dilution—"dilution by blurring" and "dilution by tarnishment." *Mayo*, 2016 WL 7839144, at *2. H-D has proved both types of dilution.

### a. Dilution by Blurring

The Lanham Act defines "dilution by blurring" as "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark." 15 U.S.C. § 1125(c)(2)(B). Dilution by blurring occurs when consumers "see the plaintiff's mark used on a plethora of different goods and services, raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product." *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 466 (7th Cir. 2000) (citation omitted). The Lanham Act sets out a non-exclusive list of factors for courts to consider to determine whether dilution by blurring is likely to occur: (1) the similarities between the marks; (2) the degree of inherent or acquired distinctiveness of the famous mark; (3) the extent to which the plaintiff is engaging in substantially exclusive use of the famous mark; (4) the degree of recognition of the famous mark; (5) defendant's intent to create association with the famous mark; and (6) any actual association between the marks. 15 U.S.C. § 1125(c)(2)(B).

Here, SunFrog used identical or materially indistinguishable variations of the H-D Marks, the H-D Marks are distinctive and famous, and SunFrog intended to create an association with the H-D Marks and trade on their goodwill for SunFrog's own profit. There is no question that consumers familiar with the renown and prestige of the H-D Marks, when encountering the

11

identical or virtually identical marks used on the Infringing Products, are likely to immediately

make an association with H-D.  Therefore, SunFrog's uses of the H-D Marks are likely to dilute

the distinctive quality of those marks.  *See Mayo*, 2016 WL 7839144, at *2 ("[defendant's] sale

of counterfeit products bearing HD's marks clearly intends to use that long-developed goodwill

for its own profit" and constituted dilution by blurring); *Lorillard Tobacco Co. v. Van Dyke

Liquor Mktg., Inc.*, 471 F. Supp. 2d 822, 833 (E.D. Mich. 2007) ("defendant's use of [the

NEWPORT mark] on counterfeit cigarettes dilutes the quality of [p]laintiff's mark because it

diminishes the ability of the mark to identify and distinguish the goods"); *Coach, Inc. v.

Melendez*, No. 10-cv-6178, 2011 WL 4542971, at *4 (S.D.N.Y. Sept. 2, 2011) (holding that "by

using counterfeits and infringements of the Coach Registered Trademarks on their goods,

defendants are trading on the goodwill and reputation of Coach" and "have dilute[d], tarnished,

and blurred the Coach Registered Trademarks").

### b.      Dilution by Tarnishment

Dilution by tarnishment "is association arising from the similarity between a mark or

trade name and a famous mark that harms the reputation of the famous mark."  15 U.S.C. § 1125

(c)(2)(C).  SunFrog's actions consist of dilution by tarnishment in several ways.  First, the H-D

Marks are premium brands and H-D has a reputation for providing a wide variety of high-quality

merchandise under those brands itself and through its dealers and licensees.  (SPMF ¶ 11.)

Consistent with its image as a premium brand, H-D positions its licensed merchandise as high-

quality merchandise sold through select channels of trade. (*Id.* ¶ 13.)  SunFrog's use of

counterfeit marks on knockoff products sold on an online t-shirt store (*Id.* ¶ 54) creates a great

risk that the knockoffs will harm the public and H-D in a number of ways.  *Rolex Watch U.S.A.,

Inc. v. Canner*, 645 F. Supp. 484, 494–95 (S.D. Fla. 1986).

Second, to ensure and maintain the premium and high-quality reputation of licensed products sold under the H-D Marks, H-D requires its licensees, including those for apparel and mugs, to comply with its extensive and stringent quality-control standards, including multiple layers of review and approvals by H-D. (SPMF ¶ 14.) SunFrog's knockoff products, however, circumvent H-D's strict quality-control standards and procedures.

Third, even if the Infringing Products had been subjected to H-D's quality control standards and met those standards, many of them would have not met H-D's "content" standards. H-D reviews its licensed products to determine if the products bear any objectionable designs or content, including those inconsistent with H-D's image and reputation. (SPMF ¶¶ 15-16.) Here, a number of SunFrog's Infringing Products displayed vulgar, offensive, political, and/or religious content that H-D would not have approved as licensed products. (*Id.* ¶¶ 61-64.) H-D also reviews its licensed products for proper use of the H-D Marks. (*Id.* ¶¶ 15-16.) Some of SunFrog's shirts modify or mutilate the H-D Marks, or display marks that H-D does not license, and H-D would not have approved those products as licensed products. (*Id.* ¶¶ 60, 65.)

In short, consumers purchasing or encountering the Infringing Products are likely to associate with H-D any issues regarding the quality of the Infringing Products and/or any offensive messages or prohibited content on the Infringing Products. This in turn could cause such consumers to refrain from purchasing genuine H-D licensed products in the future. SunFrog's Infringing Products thus are likely to dilute the H-D Marks by tarnishment. *See Mayo*, 2016 WL 7839144, at *2 (holding that defendant's use of counterfeits of HARLEY-DAVIDSON and the Bar & Shield Logo constituted dilution by tarnishment); *Melendez*, 2011 WL 4542971, at *5 (holding that defendant's use of counterfeits of Coach's trademarks constituted dilution by tarnishment).

### D. SunFrog's Violations of H-D's Trademark Rights are Willful

Willful infringement occurs when the defendant acts with knowledge that its conduct constitutes infringement or shows a reckless disregard for the trademark owner's rights. *Deckers Outdoor Corp. v. Does 1-55*, No. 11-C-10, 2011 WL 4929036, at *5 (N.D. Ill. Oct. 14, 2011) (quoting *Lorillard Tobacco Co. v. S & M Cent. Service Corp.*, No. 03 C 4986, 2004 WL 2534378, *7 (N.D. Ill. Nov. 8, 2004)). Knowledge can be inferred from a defendant's conduct. *Deckers*, 2011 WL 4929036, at *5. A defendant that engages in "ostrich-like business practices" will be held accountable for being willfully blind. *Microsoft Corp. v. Rechanik*, 249 F. App'x 476, 479 (7th Cir. 2007) (holding the defendant liable for willful counterfeiting on summary judgment because even though the defendant claimed that he did not "know the products were counterfeit," he admitted that he purchased the products from unauthorized distributors, did not ask whether they were authentic, and did not examine them to satisfy himself that they were not counterfeit). Willful blindness is equivalent to actual knowledge for purposes of the Lanham Act. *Hard Rock Cafe Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143, 1149 (7th Cir. 1992).

### 1. SunFrog Continued the Counterfeiting, Infringement and Dilution of the H-D Marks Despite Receiving 70+ Takedown Complaints From H-D

Evidence that a defendant continued infringing activity despite actual notice of infringement "is perhaps the most persuasive evidence of willfulness[.]" *Mayo*, 2016 WL 7839144 at *2 (finding willfulness where defendant "repeatedly attempted to continue selling its counterfeit goods despite having notice of its infringement"); *Chi-Boy Music v. Charlie Club, Inc.*, 930 F.2d 1224, 1227 (7th Cir. 1991) (rejecting defendant's argument that its activities were not willful because it was unaware that a license was necessary); *White v. Marshall*, 771 F. Supp. 2d 952, 958 (E.D. Wis. 2011) ("notice accorded to an alleged infringer before the acts of

infringement occurred is perhaps the most persuasive evidence of willfulness") (citation omitted).

Here, SunFrog failed to halt is illegal activities despite H-D submitting more than 70 takedown complaints to SunFrog between October 2016 and May 2017 that: (a) notified SunFrog of H-D's rights in the H-D Marks, and (b) reported and objected to 800+ Infringing Products that were advertised, offered for sale, and/or sold on SunFrog's Website. (SPMF ¶ 54.) Specifically, SunFrog knowingly continued to: (1) advertise and sell numerous Infringing Products bearing the identical H-D Marks cited in H-D's prior objections to SunFrog; (2) allow the same anonymous sellers that were repeat infringers of the H-D Marks and identified in H-D's prior objections to offer and sell additional Infringing Products on SunFrog's Website; (3) advertise and sell numerous Infringing Products bearing designs *identical* to designs of Infringing Products previously objected to by H-D. Indeed, SunFrog not only continued infringing activity – it ***expanded*** its infringement by adding Infringing Products like leggings and mugs. (*Id.* ¶¶ 77-81.)

Significantly, this case is not an isolated instance of SunFrog inadvertently running afoul of the trademark laws. Before H-D sued SunFrog on May 19, 2017, SunFrog was sued for trademark infringement and/or counterfeiting in seven other cases filed between September 2016 and April 2017. (SPMF ¶ 43.) Despite actual knowledge that SunFrog's Website offered countless infringing and counterfeit products based on prior litigations and numerous demand letters and takedown requests filed or sent by H-D and other trademark owners, SunFrog knowingly continued to directly engage in and assist and encourage others in massive counterfeiting and infringement of the H-D Marks. (*Id.* ¶ 43, 54.)

### 2. SunFrog's Continued Infringement and Counterfeiting After the Filing of this Lawsuit is Strong Evidence of Willfulness

SunFrog represented in its PI Opposition Brief filed on June 21, 2017, that it had implemented "non-monetary relief" that "fully resolve[d]" H-D's concerns and mooted H-D's PI Motion, i.e., SunFrog's counterfeiting and infringement had ceased. (SPMF ¶ 82; Dkt. 16, pp. 5-7.) H-D established, however, that SunFrog's counterfeiting and infringement had *not* ceased, and had in fact expanded, at the time that SunFrog's Opposition Brief was filed and when H-D filed its July 5, 2017 Reply Brief. (*Id.* ¶¶ 83-90.) H-D further established that SunFrog's counterfeiting and infringement of the H-D Marks, contrary to SunFrog's representations to the Court, continued up to the July 14, 2017 scheduling conference. (*Id.* ¶¶ 91-97.) Indeed, the Court found in its PI Order on July 31, 2017 that "even after SunFrog filed its brief in opposition to the motion for preliminary injunction (and even as of the day of the Court's Rule 16 scheduling conference a month later), most of the infringing products Harley-Davidson identified initially were still advertised on SunFrog's website and available for sale" and issued a preliminary injunction. ((*Id.* ¶ 98; Dkt. 33, p. 6.)

### 3. SunFrog's Violations of the July 31, 2017 PI Order

Even after the Court issued the PI Order on July 31, 2017—more than two months after this lawsuit was filed—SunFrog continued its infringing and counterfeiting of the H-D Marks for weeks after being enjoined. H-D sent SunFrog's counsel emails on August 7, 11, 15, and 18, 2017, October 25, 2017, and November 15, 2017 documenting SunFrog's violations of the PI Order, including continuing as well as new violations. (SPMF ¶¶ 99-109.) SunFrog's failure to promptly comply with the PI order on its own is further evidence of willfulness.

### 4. SunFrog's Bad-Faith Litigation Conduct Further Supports a Finding of Willfulness

SunFrog's various misrepresentations to the Court and other conduct in this case further support a finding of willfulness. First, as discussed above, SunFrog falsely represented in its Opposition Brief filed on June 21, 2017, and to this Court at the July 14, 2017 scheduling conference, that H-D's PI Motion was moot because SunFrog had ceased all violations of the H-D Marks. (SPMF ¶ 112.)

Second, contrary to SunFrog's representations to this Court in its PI Opposition Brief that it had no capabilities to implement trademark screening for the H-D Marks (Dkt. 16, p. 2), SunFrog told other trademark owners as early as *2014* that SunFrog did engage in various forms and levels of trademark screening. (SPMF ¶¶ 114-115; Dkt. 19, p. 6.) Here, however, SunFrog directly engaged in and assisted and encouraged others in massive infringement and counterfeiting of the H-D Marks despite having screening capabilities that could have prevented most if not all of the violations. (SPMF ¶ 116.)

Third, SunFrog actively facilitated the advertisement of Infringing Products on Facebook, yet SunFrog only took action to police infringement on Facebook *after* the July 14, 2017 Scheduling Conference, claiming that it didn't "recognize" that Infringing Products were promoted on Facebook until that time. (SPMF ¶ 117.) SunFrog, however, had long touted Facebook as the primary means to sell products on SunFrog's Website; had long offered its sellers various advice and training on how to sell using Facebook; and had long known that the majority of its sales came through Facebook. (*Id.* ¶¶ 38-40, 117.)

Fourth, SunFrog falsely represented to this Court that it would have ceased all infringement had H-D simply sent a demand letter or called SunFrog (SPMF ¶ 118; Dkt. 11, pp. 1, 6), but that argument is contrary to SunFrog's actions in at least four other recent, prior

trademark litigations in which the trademark owners were forced to sue SunFrog *after* SunFrog failed to respond to one or more demand letters and/or multiple calls from the trademark owners. (SPMF ¶ 118-120.)

Fifth, SunFrog falsely represented to this Court that it "responded expeditiously" to H-D's takedown complaints. (SPMF ¶ 122.) To the contrary, SunFrog did not immediately or promptly remove the Infringing Products upon receipt of H-D's takedown complaints, as it typically took 2-3 days and as long as 7 days to remove the objected-to Infringing Products. (*Id.* ¶ 70.) For example, of the 548 Infringing Products to which H-D submitted takedown complaints in the Low Declaration (Dkt. 10), SunFrog took 3 or more days to remove 78% of the Infringing Products and 4-7 days for 35% of the Infringing Products. (*Id.*) During this delay in addressing H-D's takedown complaints, SunFrog continued to offer and sell Infringing Products for its financial gain. (*Id.* ¶ 77.)

Finally, SunFrog wasted this Court's time and resources by filing a frivolous Motion to Dismiss. (Dkt. 27.) This Court found SunFrog's motion "wholly without merit." (Dkt. 40, p. 12.) In addition to raising non-meritorious legal arguments, SunFrog did not even bother to explain how H-D's detailed and specific factual allegations were sufficiently conclusory to justify dismissal. (*Id.,* p. 5.)

E. **H-D is Entitled to Maximum Statutory Damages For SunFrog's Willful Trademark Counterfeiting**

1. **Statutory Damages In General**

A trademark owner may elect to recover statutory damages, rather than actual damages and profits, for the use of a counterfeit mark in connection with goods or services "sold, offered for sale, or distributed." 15 U.S.C. § 1117(c). Courts have broad discretion to determine the appropriate amount of statutory damages, and need not follow any rigid formula. *See, e.g.,*

*Conn-Selmer, Inc. v. Apex Industries, Inc.*, 04C0245, 2006 WL 752895, at *2 (E.D. Wis. Mar. 20, 2006). Indeed, statutory damages are the appropriate remedy where a plaintiff's actual damages caused by defendant's infringement are difficult to prove, nominal, or even non-existent. *See Under Armour, Inc. v. 51nfljersey.com*, 13-62809-CIV, 2014 WL 1652044, at *7 (S.D. Fla. Apr. 23, 2014) ("An award of statutory damages is appropriate despite a plaintiff's inability to provide actual damages caused by a defendant's infringement."); *Ford Motor Co. v. Cross*, 441 F. Supp. 2d 837, 852 (E.D. Mich. 2006) ("[A] successful plaintiff in a trademark infringement case is entitled to recover enhanced statutory damages even where its actual damages are nominal or non-existent.").

Statutory damages are appropriate even where a defendant claims it lost money. In *Diane Von Furstenberg Studio v. Snyder*, the counterfeiter claimed it had lost money, but the court held that "Even if the actual dollar amount of [defendant's] profits was low, [defendant] caused damage to [plaintiff] by selling counterfeit dresses as 'authorized. Statutory, rather than actual, damages are appropriate in this case, because even if [defendant's] actual profits are ascertainable, they do not accurately represent the loss suffered by [plaintiff]." No. 1:06CV1356, 2007 WL 3143690, at *5 (E.D. Va. Oct. 23, 2007), *aff'd*, 294 F. App'x 10 (4th Cir. 2008). Nor must statutory damages be based on either party's profits or the trademark owner's lost profits. *See Versace v. Awada*, No. CV033254, 2010 WL 11515467, at *4 (C.D. Cal. Aug. 2, 2010) (rejecting defendant's argument that "the purported variance between the damage award and various profit figures from [plaintiff] and [defendant]" should affect the award of statutory damages because such "variance" has "no bearing on the validity of the award").

Courts may award an amount no less than $1,000 and up to $200,000 per counterfeit mark per type of goods "sold, *offered for sale,* or distributed"; or up to $2,000,000 per

counterfeit mark per type of goods if use of the mark was willful.  15 U.S.C. § 1117(c) (emphasis

added); *Under Armour*, 2014 WL 1652044, at *7.  Accordingly, even if SunFrog did not sell

some of the Infringing Products offered for sale on SunFrog's Website, H-D is entitled to

statutory damages for the counterfeiting of such products.  For example, if a defendant is found

to willfully counterfeit one mark on three different types of apparel offered for sale or sold,

courts may award up to $6,000,000 in total statutory damages, calculated by multiplying the

statutory maximum award ($2,000,000) by the number of goods involved (3).

An award of statutory damages should include both a compensatory portion and a

punitive component to deter future counterfeiting by the defendant and third parties.  *See Rolls-

Royce PLC v. Rolls-Royce USA, Inc.*, 688 F. Supp. 2d 150, 157 (E.D.N.Y. 2010) (statutory

damages have a "compensatory and punitive function" and "serve a punitive, deterrent

function"); *Coach, Inc. v. Zhen Zhen Weng*, No. 13 CIV 445, 2014 WL 2604032, at *18

(S.D.N.Y. June 9, 2014) ("Congress intended the statutory damages under 15 U.S.C. § 1117(c) to

both compensate and deter."); *Louis Vuitton Malletier & Oakley, Inc. v. Veit*, 211 F. Supp. 2d

567, 583 (E.D. Pa. 2002), *amended* (June 28, 2002) (courts use "their wide discretion to

compensate plaintiffs, as well as to deter and punish defendants"); *Nike, Inc. v. Top Brand Co*.,

No. 00 CIV 8179 KMW/RLE, 2006 WL 2946472, at *2 (S.D.N.Y. Feb. 27, 2006) (explaining

that "courts have looked both to the compensatory and punitive aspects of the actual damages

sections of the trademark infringement statute. Thus, the amount of defendants' likely profits

from their infringement, the possibility of deterrence, and the need for redress of wrongful

conduct are appropriate factors to consider.") (citations omitted).

In the absence of clear guidelines for setting a statutory damage award, courts have used

their wide discretion to compensate plaintiffs, as well as to deter and punish defendants, often

borrowing from factors developed in fixing a statutory damage award for copyright infringement. *See, e.g.*, *Chi-Boy Music v. Charlie Club, Inc.*, 930 F.2d 1224, 1229 (7th Cir. 1991) (explaining that courts may consider factors such as "the difficulty or impossibility of proving damages, the circumstances of the infringement, and the efficacy of the damages as a deterrent to future copyright infringement").

Courts do not hesitate to award maximum or high statutory damages in large-scale counterfeiting cases like this one. For example, in *Nike, Inc. v. Top Brand Co.*, the court found that "the size of the defendants' infringing operations, which led to the production of millions of infringing goods produced, the willfulness of their conduct, and their behavior in this litigation all weigh towards a grant of the maximum in statutory damages." 2006 WL 2946472 at *2. The court awarded the plaintiff the then-maximum award for statutory damages of $1 million per mark per type of good for a total of $12 million for defendant's use of counterfeits of four Nike trademarks on three types of goods and $5 million for defendant's use of five Adidas trademarks on one type of shirt. *Id.*; *see also Sara Lee Corp. v. Bags of New York, Inc.*, 36 F. Supp. 2d 161, 169–70 (S.D.N.Y. 1999) (awarding $750,000 per mark per type of good given the defendants' high level of willfulness and their repeated efforts to defy and mislead the court, where the size of operations was at least $230,000 in counterfeit goods). In fact, courts have regularly awarded the maximum statutory amount in counterfeiting cases. *Coach, Inc. v. Zhen Zhen Weng*, 2014 WL 2604032, at *18. And this Court awarded H-D the maximum amount of $6,000,000 in statutory damages for use of one mark on three different counterfeit products. *Mayo*, 2016 WL 7839144, at *2.

### 2. SunFrog Has Distributed, Offered For Sale, and/or Sold More Than 64 Different Counterfeit Products

In determining the number of "types" of goods, courts distinguish between different types of products within a broad product category. For example, for apparel, courts treat shirts, t-shirts, tank tops, long-sleeved shirts, open-necked shirts, dress shirts, polo shirts, athletic shirts, sweatshirts, hooded sweatshirts, and sweaters each as a separate type of good, rather than considering them all broadly as one type of good. *See Abercrombie & Fitch Trading Co. v. 2cheapbuy.com*, 14-60250-CIV, 2014 WL 11706447, at *7 (S.D. Fla. June 4, 2014) (holding that 25 types of clothing were separate types of goods, including shirts, t-shirts, tank tops, polo shirts, sweatshirts, sweaters, jeans, pants, and hats); *Under Armour, Inc*, 13-62809-CIV, 2014 WL 1652044, at *8 (holding that 17 different types of clothing were separate types of goods, including t-shirts, shirts, polo shirts, tank tops, sports jerseys, sleeveless jerseys, pants, shorts, and baseball caps); *Rolls-Royce PLC v. Rolls-Royce USA, Inc.*, 688 F. Supp. 2d 150, 159 (E.D.N.Y. 2010) (holding that 20 different types of clothing were separate types of goods, including athletic shirts, dress shirts, polo shirts, open-necked shirts, long-sleeved shirts, hooded sweatshirts, athletic hats, and athletic pants). Where defendants themselves distinguish between types of apparel, the court may also consider these self-imposed distinctions in determining the types of counterfeit goods at issue. *See Rolls-Royce*, 688 F. Supp. 2d at 159 (holding that because defendant specifically distinguished 20 different types of apparel in its own trademark filing, the court would adopt those as separate types of products for statutory damages purposes).

Here, SunFrog distributed, offered for sale, and sold counterfeits of the seven H-D Marks on *twelve* types of goods: ladies' t-shirts, mens' t-shirts, youth t-shirts, ladies' v-neck shirts, mens' v-neck shirts, long-sleeve shirts, tank tops, sweatshirts, hoodies, leggings, mugs, and hats. Each of these products is a separate type of good under the precedent cited above. (SPMF ¶ 55).

In addition, like the defendant in *Rolls-Royce*, 688 F. Supp. 2d at 159, SunFrog itself distinguishes between these apparel as separate "types" of goods by: (1) listing each of these twelve types of goods separately on pages and drop-down menus of SunFrog's Website offering the Infringing Products for sale (*Id.*); and (2) distinguishing between types of goods in its trademark filing for the mark SUNFROG as to apparel products for men, women, and children; short-sleeved or long-sleeved t-shirts; and sweatshirts versus hooded sweatshirts. (*Id.* ¶ 42).

Across the twelve types of goods and seven H-D Marks, SunFrog advertised, offered for sale, sold, and/or distributed a *minimum* of 64 different types of counterfeit products as shown in the chart below (i.e., per mark per type of goods):

| TYPE OF GOODS | HARLEY-DAVIDSON | HARLEY | H-D | HD | (Harley-Davidson Motor Cycles bar & shield logo) | (skull logo) | (No. 1 Harley-Davidson logo) |
|---|---|---|---|---|---|---|---|
| LADIES TEE | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| MENS TEE | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| YOUTH TEE | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| LADIES V-NECK | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| `MENS V-NECK | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| LONG SLEEVE SHIRT | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| TANK TOP | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| SWEATSHIRT | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | |
| HOODIE | ✓ | | | | ✓ | | |
| LEGGINGS | ✓ | | | | ✓ | ✓ | |
| MUG | ✓ | | | | ✓ | | |
| HAT | ✓ | | | | ✓ | | |

The shaded cells above reflect goods not currently covered by a federal trademark registration for the noted H-D Mark. The unchecked, white cells reflect federally registered H-D Marks

covering the noted products but for which H-D has not yet discovered any SunFrog products bearing those marks.  (SPMF ¶ 55.)

The actual number of counterfeit products is much greater than 64.  The chart above reflects only *one* counterfeit Infringing Design bearing an H-D mark used on each type of product.  SunFrog, however, has offered most if not all of the product types referenced above with multiple, distinct Infringing Designs, many of which bear two or more H-D Marks, and *each* such product is a separate counterfeit of each H-D Mark it bears. The magnitude of SunFrog's unauthorized uses of the H-D Marks is shown in the chart below that lists the number of times each of the H-D Marks appeared on each type of the Infringing Products from just March to August 2017.  The result is that SunFrog has offered for sale more than *1,325* different counterfeit products bearing the H-D marks and has made more than *2,575* unauthorized uses of the H-D Marks.[5]

| PRODUCT | HARLEY-DAVIDSON | HARLEY | H-D | HD |  |  |  |
|---|---|---|---|---|---|---|---|
| LADIES TEE | 138 | 14 | 2 | 2 | 131 | 7 | 10 |
| MENS TEE | 146 | 14 | 2 | 2 | 138 | 6 | 9 |
| YOUTH TEE | 103 | 11 | 2 | 2 | 96 | 3 | 7 |
| LADIES V-NECK | 137 | 13 | 2 | 1 | 124 | 7 | 10 |
| MENS V-NECK | 138 | 13 | 2 | 1 | 125 | 7 | 10 |
| LONG SLEEVE SHIRT | 124 | 13 | 2 | 1 | 116 | 4 | 8 |
| TANK TOP | 139 | 13 | 2 | 1 | 124 | 7 | 10 |

---

[5] For products bearing the mark , they are counted in the above chart as bearing both the Bar & Shield Logo, for which H-D owns a registration without any wording (i.e., a "blank" Bar & Shield Logo), and the mark HARLEY-DAVIDSON.

| | | | | | | |
|---|---|---|---|---|---|---|
| **SWEATSHIRT** | 135 | 13 | 2 | 1 | 122 | 7 | |
| **HOODIE** | 134 | | | | 124 | | |
| **LEGGINGS** | 20 | | 0 | | 12 | 1 | |
| **MUG** | 9 | | | | 10 | 0 | 0 |
| **HAT** | 1 | | 0 | 0 | 2 | 0 | 0 |
| **TOTALS** | **1224** | **104** | **16** | **11** | **1124** | **49** | **64** |

(SPMF ¶¶ 56-58.)

Where a defendant uses a variety of designs that each infringes a plaintiff's mark, the court may consider each individual design as a separate "type" of good. *See Chanel, Inc. v. Louis*, 06-CV-5924ARRJO, 2009 WL 4639674, at *14–15 (E.D.N.Y. Dec. 7, 2009). For example, the *Chanel* court found that the bags shown below, which are similar and bear the same mark in different ways, were each a separate type of good.



*Id*. Representative examples of different Infringing Products bearing H-D's famous Bar & Shield Logo, but with a distinctly different design on each product, are shown below.



25



(SPMF ¶ 57.)

### 3. The Court Should Award H-D at least $128,000,000 in Statutory Damages

As shown above in Section D, SunFrog's actions were willful and thus subject to the maximum statutory damages. SunFrog advertised, offered for sale, and sold products that bore marks identical to the H-D Marks. The use of identical marks establishes that SunFrog intended to confuse consumers into believing that its counterfeit merchandise was affiliated with or originated from H-D. *See Coach, Inc.*, 2014 WL 2604032, at *18; *Microsoft Corp. v. CMOS Tech., Inc.,* 872 F. Supp. 1329, 1335 (D.N.J. 1994) ("It would be difficult to imagine a clearer case of consumer confusion than the instant case in which the defendants, acting in direct competition with the plaintiff, sold counterfeit products on which plaintiff's registered marks appear in their entirety."); *PetMed Express, Inc. v. MedPets.Com, Inc.*, 336 F. Supp. 2d 1213, 1220 (S.D. Fla. 2004) ("[T]he Court infers from [d]efendants' use of such a confusingly similar

mark that [d]efendants had the specific intent to confuse consumers into believing that [defendant] was affiliated with [plaintiff].").

Courts also award high statutory damages where a defendant's counterfeiting activities attract wide market exposure through internet traffic or advertising, both of which are present here. *See Burberry LTD. & Burberry USA v. Designers Imports, Inc.*, 2010 WL 199906, at *10–11 (S.D.N.Y. Jan. 19, 2010) (awarding $1.5 million in statutory damages, "because of Defendant's ability to reach a vast customer base through internet advertising"); *Louis Vuitton Malletier & Oakley, Inc. v. Veit*, 211 F. Supp. 2d 567, 584 (E.D. Pa. 2002) (awarding $1.5 million in statutory damages despite no evidence of the actual scope of defendant's sales, in part because "the scope of the internet supermarket" implies that "such sale offerings are presumptively quite high"). Here, SunFrog's Website received wide market exposure and SunFrog engaged in extensive social media advertising and marketing. First, during SunFrog's counterfeiting and infringement of the H-D Marks, SunFrog's Website was one of the "highest trafficked websites" in the country. (SPMF ¶ 53.) Second, SunFrog's Website and business has enjoyed massive commercial success, including more than $100 million in annual sales, selling tens of thousands of shirts per day, and becoming the largest maker of printed t-shirts in the country. (*Id.* ¶¶ 51-52.) Third, SunFrog facilitates and encourages widespread promotion and advertising of the Infringing Products through social media, and the vast majority of SunFrog's sales come from Facebook promotions. (*Id.* ¶¶ 36-40.)

Finally, the statutory damages award here should consider the necessity of deterring future counterfeiting by SunFrog and others. Given SunFrog's willful conduct in allowing the massive counterfeiting of the H-D Marks to continue after H-D's 70+ takedown notices, after H-D filed this lawsuit, and after H-D filed its PI Motion, and in failing to comply with the PI

Order, the maximum statutory award of $2 million per mark per type of good is justified here. This Court previously awarded H-D the maximum amount of statutory damages for counterfeit products. *Mayo*, 2016 WL 7839144 at *2 (awarding maximum of $2 million per mark per type of good for a total of $6,000,000).

Taking all of the above into account, H-D submits that it is entitled to the statutory maximum of $2 million per counterfeit mark for at least 64 instances of willful counterfeiting across the twelve types of goods and seven H-D Marks, for a total of $128 million.[6]

### F.     H-D is Entitled to A Permanent Injunction

#### 1.     Permanent Injunction Standard

To obtain a permanent injunction, H-D must demonstrate that (1) it has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *Mayo*, 2016 WL 7839144 at *2 (granting permanent injunction for trademark counterfeiting).

#### 2.     H-D Has Suffered Irreparable Injury and Remedies Available at Law are Inadequate

This Court has found that "it is well-settled that courts presume irreparable harm to the plaintiff where there are violations of the Lanham Act . . . Likewise, injuries to a company's goodwill or reputation, such as are caused by trademark infringement, are not susceptible to precise valuation. Thus, a showing of infringement is generally sufficient to establish that

---

[6] In addition, H-D is entitled to SunFrog's profits or H-D's actual damages for any infringements of H-D's trademarks for goods that are not subject to a federal trademark registration, i.e., non-counterfeit infringements, SunFrog's profits for such non-counterfeit infringements, statutory damages for copyright infringement, and H-D's attorney's fees in view of SunFrog's willful infringement. 15 U.S.C. § 1117; 17 U.S.C. § 504.

28

remedies at law are inadequate." (PI Order, Dkt. 33, p. 3.) *See also Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 813 (7th Cir. 2002); *Meridian Mut. Ins. Co. v. Meridian Ins. Grp., Inc.*, 128 F.3d 1111, 1120 (7th Cir. 1997). The presumption is founded upon the reasoning that "it is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill, caused by such violations." *Abbott Labs v. Mead Johnson & Co.*, 971 F.2d 6, 16 (7th Cir. 1992).

Even without the presumption, H-D has demonstrated that SunFrog's actions have caused H-D to suffer irreparable harm in the form of loss of control over its reputation and goodwill. Injury to goodwill is an irreparable harm for which there is no adequate remedy at law. *See Promatek Indus., Ltd.*, 300 F.3d at 813. SunFrog uses the H-D Marks on identical products that are not subject to the rigorous quality control and content review that H-D exercises over its licensed products. (SPMF ¶ 59.) The result is that H-D has no control over its brands that reflect directly on H-D's reputation and goodwill. SunFrog's actions have thus irreparably injured and, if continued, will further irreparably injure the H-D Marks and H-D's reputation and goodwill associated with those marks. *See Re/Max North Cent., Inc. v. Cook*, 272 F.3d 424, 432 (7th Cir. 2001) ("[D]amage to a trademark holder's goodwill can constitute irreparable injury for which the trademark owner has no adequate legal remedy.").

### 3. The Harm to H-D if an Injunction is Not Granted Far Outweighs the Harm to Defendants if an Injunction is Granted

H-D has proven a clear-cut case of trademark infringement, dilution, and counterfeiting and has shown that the harm to H-D and the H-D Marks is immense and irreparable. In contrast, SunFrog's only "harm" if enjoined is that it could not advertise, print, and sell Infringing Products, which is purely economic. A permanent injunction, moreover, will not put SunFrog

out of business as it can still sell other products on SunFrog's Website. The balance of hardships thus decidedly tips in favor of H-D.

### 4. An Injunction Protects the Public From Confusion

The public interest is served by "not being deceived about the products they purchased." *Int'l Kennel Club of Chi., Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1092 n.8 (7th Cir. 1988); *see also Promatek Indus., Ltd.*, 300 F.3d at 813–14 ("because the injunction prevents consumer confusion in the marketplace, the public interest will be served as well"). The public also has a clear interest in the elimination of counterfeit goods from the marketplace. *Bulgari, S.P.A. v. Zou Xiaohong*, No. 15-CV-05148, 2015 WL 6083202, at *3 (N.D. Ill. Oct. 15, 2015). As this Court found in granting H-D's PI Motion, "Stopping [SunFrog's infringement and counterfeiting] will serve both to protect Harley-Davidson's interest in its consumer goodwill and vindicate the public's interest in avoiding deception as to the source or sponsorship of the goods they purchase." (Dkt. 33, p. 3.) H-D is thus entitled to the conversion of the preliminary injunction in effect into a permanent injunction.

## III. CONCLUSION

For the reasons and authorities discussed above, H-D respectfully requests that this Court grant H-D's Motion for Partial Summary Judgment.

Dated this 17th day of November, 2017

**MICHAEL BEST & FRIEDRICH LLP**

By:___*s/Katherine W. Schill*_____
    Katherine W. Schill, SBN 1025887
    100 East Wisconsin Avenue
    Suite 3300
    Milwaukee, WI 53202-4108
    kwschill@michaelbest.com
    Phone:  (414) 223-2527
    Fax:  (414) 277-0656

    **KELLY IP, LLP**
    David M. Kelly
    Stephanie H. Bald
    Sabrina Y. Shyn
    1919 M Street NW, Suite 610
    Washington, D.C. 20036
    david.kelly@kelly-ip.com
    stephanie.bald@kelly-ip.com
    sabrina.shyn@kelly-ip.com
    Phone:  (202) 808-3570
    Fax:  (202) 354-5232

    **Attorneys for Plaintiffs**
    **H-D U.S.A., LLC and**
    **Harley-Davidson Motor Company Group, LLC**