**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**

H-D U.S.A., LLC and HARLEYDAVIDSON )
MOTOR COMPANY GROUP, LLC, )
                                      )
         Plaintiffs, )       Case No. 17-cv-711-JPS
                                      )
        v. )
                                      )
SUNFROG, LLC d/b/a SUNFROG )
SHIRTS and JOHN DOES, )
                                      )
        Defendants. )

---

**RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT**

---

# TABLE OF CONTENTS

SUMMARY OF ARGUMENT ................................................................................. 1

STANDARD OF REVIEW ................................................................................... 3

ARGUMENT ......................................................................................................... 4

I.  PLAINTIFFS' MONETARY DEMAND IS IMPROPER ................................................. 4

II.  PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT IS PREMATURE BECAUSE NO DISCOVERY HAS BEEN TAKEN ........................................................ 8

III.  GENUINE ISSUES OF MATERIAL FACT MUST BE ADDRESSED BEFORE CONSIDERING PLAINTIFFS' COUNTERFEITING CLAIM ..................................... 10

IV.  GENUINE ISSUES OF MATERIAL FACT BAR LIABILITY FOR DIRECT TRADEMARK INFRINGEMENT AS WELL AS UNFAIR COMPETITION ............. 13

    A.  SunFrog Does Not Use the Asserted Marks in Commerce or as Trademarks ...... 13

    B.  Bad Actors on SunFrog's Site Created No Likelihood of Confusion .................. 17

    (1)  Differences Between the Marks/ Strength of Marks .............................................. 18
    (2)  Scope and Manner of the Current Use ................................................................. 19
    (3)  Degree of Care Exercised by the Relevant Consumers ....................................... 20
    (4)  Strength of the Plaintiffs' Marks......................................................................... 20
    (5)  There is No Evidence of Actual Confusion ......................................................... 20
    (6)  SunFrog's Intent.................................................................................................. 20
    C.  SunFrog is Not Secondarily Liable ...................................................................... 21

V.  PLAINTIFFS' UNFAIR COMPETITION CLAIM MUST FAIL .................................. 26

VI.  GENUINE ISSUES OF MATERIAL FACT PROHIBIT FINDING SUNFROG LIABLE FOR FALSE DESIGNATION OF ORIGIN AS A MATTER OF LAW ......................... 27

VII.  GENUINE ISSUES OF MATERIAL FACT MAKE A DILUTION ANALYSIS INAPPROPRIATE AT THIS TIME ............................................................................. 28

CONCLUSION..................................................................................................... 29

# TABLE OF AUTHORITIES

**Cases**

*A.J. Canfield Company v. Concord Beverage Company*,
629 F.Supp. 200 (E.D. Pa. 1985) .................................................................. 27

*A.J. Canfield Company v. Honickman*,
808 F.2d 291 (3d Cir. 1986) ......................................................................... 27

*AHP Subsidiary Holding Company v. Stuart Hale Company*,
1 F.3d 611 (7th Cir. 1993) ............................................................................. 9

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........................................................................................ 3

*Audemars Piguet Holding S.A. v. Swiss Watch Intern., Inc.*,
No. 12 Civ. 5423 (LAP), 2015 WL 150756 (S.D.N.Y. Jan. 12, 2015) ............... 10, 11

*Barker v. Henderson, Franklin, Starnes & Holt*,
797 F.2d 490 (7th Cir. 1986) ......................................................................... 3

*Celotex Corporation v. Cartrett*,
477 U.S. 317 (1986) ........................................................................................ 3

*Ciociola v. Harley-Davidson Inc.*,
552 F. Supp. 2d 845 (E.D. Wis. 2008) ......................................................... 13

*Coach, Inc. v. Treasure Box, Inc.*,
No. 3:11CV468-PPS, 2014 WL 888902 (N.D. Ind. Mar. 6, 2014) ................. 8

*Coach, Inc. v. Zhen Zhen Weng*,
No. 13 Civ. 445, 2014 WL 2604032 (S.D.N.Y. June 9, 2014) ...................... 6

*Eli Lilly & Co. v. Natural Answers, Inc.*,
233 F.3d 456 (7th Cir. 2000) ....................................................................... 28

*Excelled Sheepskin & Leather Coat Corp. v. Oregon Brewing Co.*,
No. 12 Civ. 1416 (GBD)(RLE), 2015 WL 4468083 (S.D.N.Y. July 8, 2015) ......... 10

*Feltner v. Columbia Pictures Television, Inc.*,
523 U.S. 340, 118 S. Ct. 1279, 140 L. Ed. 2d 438 (1998) .......................... 9

*G. Heileman Brewing Co. v. Anheuser-Busch Inc.*,
676 F. Supp. 1436 (E.D. Wis. 1987), *aff'd*, 873 F.2d 985 (7th Cir. 1989) ......... 26, 27

*Gabbanelli Accordions & Imports, L.L.C. v. Gabbanelli*,
575 F.3d 693 (7th Cir. 2009) ....................................................................... 4

Case 2:17-cv-00711-JPS    Filed 12/22/17    Page 3 of 36    Document 50

*GMA Accessories, Inc. v. BOP, LLC,*
    765 F. Supp. 2d 457 (S.D.N.Y. 2011) ........................................................ 13, 15, 16

*GMA Accessories, Inc. v. Elec Wonderland, Inc.,*
    558 F. App'x 116 (2d Cir. 2014) ...................................................................... 15

*Gucci America, Inc. v. Guess?, Inc.,*
    868 F. Supp. 2d 207 (S.D.N.Y. 2012) ............................................................. 10

*Hard Rock Café Licensing Corp. v. Concession Servs., Inc.,*
    955 F.2d 1143 (7th Cir. 1992) ......................................................................... 23

*H-D Michigan, Inc. v. Top Quality Serv., Inc.,*
    No. 04-C-0533, 2006 WL 2547079 (E.D. Wis. Aug. 31, 2006) ......................... 3

*H-D USA LLC v. Mayo,*
    Case No. 14-CV-654-JPS, 2016 WL 7839144 (E.D. Wis. June 6, 2016) ........... 6, 28

*In Re Power Play Int'l, Inc.,*
    Serial No. 75/431,077, 2003 WL 1695913 (T.T.A.B. Mar. 26, 2003) ................ 14

*In the Rust Env't & Infrastructure, Inc. v. Teunissen,*
    131 F.3d 1210 (7th Cir. 1997) ........................................................................... 9

*Inwood Labs, Inc. v. Ives Labs., Inc.,*
    456 U.S. 844, 102 S. Ct. 2182, 72 L. Ed. 2d 606 (1982) .......................... 22, 24

*Jordache Enterprises, Inc. v. Hogg Wyld, Ltd.,*
    828 F.2d 1482 (10th Cir. 1987) ....................................................................... 28

*Kelly-Brown v. Winfrey,*
    717 F.3d 295 (2d Cir. 2013) ............................................................................ 10

*Kelly-Brown v. Winfrey,*
    No. 11 Civ. 7875 (PAC), 2012 WL 701262 (S.D.N.Y. March 6, 2012) .............. 10

*Miramar Brands Group, Inc. v. Fonoimoana,*
    Case No. CV 16-4224 PSG (RAOx), 2017 WL 2903256 (C.D. Cal. June 13, 2017) ........ 28, 29

*Nike, Inc. v. Top Brand Co.,*
    No. 00 CIV.8179 KMW RLE, 2005 WL 1654859 (S.D.N.Y. July 13, 2005) ........... 5

*Packman v. Chicago Tribune Co.,*
    267 F.3d 628 (7th Cir. 2001) ..................................................................... 13, 17

*Patterson v. TNA Entm't, LLC,*
    No. 04-C0192, 2005 WL 2077353 (E.D. Wis. Aug. 26, 2005) ......................... 17

Case 2:17-cv-00711-JPS   Filed 12/22/17   Page 4 of 36   Document 50

*RDK Corp. v. Larsen Bakery, Inc.*,
No. 02-C-0675, 2006 WL 2168797 (E.D. Wis. July 31, 2006) ................................................ 8

*Sandwiches, Inc. v. Wendy's Int'l, Inc.*,
654 F.Supp. 1066 (E.D. Wis. 1987) ................................................................................... 3

*Sara Lee Corporation v. Bags of New York, Inc.*,
36 F. Supp. 2d 161 (S.D.N.Y. 1999) ............................................................................. 5, 6

*Smith Fiberglass Prod., Inc. v. Ameron, Inc.*,
7 F.3d 1327 (7th Cir. 1993) ............................................................................................ 9

*Sorensen v. WD-40 Co.*,
792 F.3d 712 (7th Cir. 2015) ......................................................................................... 18

*Sullivan v. CBS Corp.*,
385 F.3d 772 (7th Cir. 2004) ......................................................................................... 17

*Tiffany (NJ) Inc. v. eBay Inc.*,
600 F.3d 93 (2d Cir. 2010) ..................................................................................... passim

*Tovey v. Nike, Inc.*,
No. 1:12CV448, 2014 WL 3510975 (N.D. Ohio July 10, 2014) ................................... 16, 17

*Tre Milano, LLC v. Amazon.com, Inc.*,
No B234753, 2012 WL 3594380 (Cal. Ct. App. Aug. 22, 2012) ..................................... 25, 26

*Univ. Healthsystem Consortium v. UnitedHealth Grp., Inc.*,
68 F. Supp. 3d 917 (N.D. Ill. 2014) ................................................................................ 14

*W.H. Brady Company v. Lem Products, Inc.*,
659 F.Supp. 1355 (N.D. Ill.1987) .................................................................................. 26

*Wholesale Partners, LLC v. MasterBrand Cabinets, Inc.*,
No. 12-C-747, 2013 WL 5506842 (E.D. Wis. Oct. 4, 2013) .............................................. 5

**Other Authorities**

McCarthy on Trademarks and Unfair Competition ....................................... 10, 14, 28

**Statutes, Rules and Regulations**

15 U.S.C. § 1125 ............................................................................................................ 27, 28

15 U.S.C. § 1127 ...................................................................................................... 10, 13, 14

15 U.S.C. §§ 1117 ................................................................................................................. 4

Civil L.R. 56 ......................................................................................................................... 2

Fed. R. Civ. P. 56 ................................................................................................................ 2

TMEP § 1202.03 ............................................................................................................... 14

Case 2:17-cv-00711-JPS   Filed 12/22/17   Page 6 of 36   Document 50

## SUMMARY OF ARGUMENT

Defendant SunFrog, LLC (SunFrog), by and through its attorneys, Revision Legal, PLLC and Andrus Intellectual Property Law, LLP, oppose Plaintiffs' Motion for Partial Summary Judgment. Plaintiffs' Motion for Partial Summary Judgment is premature because there are numerous unresolved questions of fact that bear on issues central to Plaintiffs' theory of SunFrog's liability and SunFrog's defenses. Without the benefit discovery, Plaintiffs can only cite to their own statement of material facts for evidentiary support. Nearly all of the cases cited by Plaintiffs, moreover, suffer from a similarly absent record, but in those cases the record did not exist because the defendants *failed to appear or failed to dispute the plaintiffs' claims*. Plaintiffs rushed to file this suit before even sending SunFrog a single demand letter. Through its notice and takedown procedure, however, SunFrog had already removed user-generated designs from its website for the Plaintiffs without a hint from the Plaintiffs that they viewed SunFrog's constantly evolving anti-infringement tools as insufficient. Now, after taking no discovery, Plaintiffs improperly and prematurely move for summary judgment demanding an outrageous and unsupported one hundred and twenty-eight million dollars ($128,000,000) in damages. Plaintiffs' brief is also noteworthy because it casually repeats the contested fact issues bearing on SunFrog's potential liability as though they are a matter of record. They are not. Plaintiffs' continuous mischaracterization of SunFrog's role in any infringing activity is not supported by the record and is strongly disputed by SunFrog.

For example, Plaintiffs aver: "H-D has established that SunFrog has used marks that are identical to or substantially indistinguishable from the H-D Marks for apparel products, hats, and mugs." (Pls.' Mem. Supp. Mot. Partial Summ. J. 4, ECF No. 44.) Whether SunFrog "has used" any of the trademarks at issue is a key question of fact that could preclude liability for trademark

1

infringement. SunFrog, however, has not ever used Plaintiffs' trademarks in commerce or in a trademark sense. (Carol Decl. ¶ 58.) Plaintiffs' constant repetition of unsupported assertions is not a substitute for a developed record. Plaintiffs presume SunFrog's "use" of the marks at issue at least eleven times without acknowledging that both "use in commerce" and use in a trademark sense are a prerequisite to its claims and dispositive issues. (Pls.' Mem. Supp. Mot. Partial Summ. J. 4, 7, 8, 11, 12, 24, 26, 29.) Despite these presumptions, Plaintiffs provide no evidence that SunFrog used any of the marks at issue in commerce or as a trademark. Plaintiffs' eagerness to move for summary judgment and reluctance to develop a record as required by Rule 56(c) of the Fed. R. Civ. P. and Civil L.R. 56(b)(1) only makes sense when viewed through the prism of Plaintiffs' one hundred twenty-eight million dollar ($128,000,000) demand.

Plaintiffs use the absence of a record in this case to disingenuously point at manufactured similarities between the facts of this case and the facts of wildly different situations involving large criminal enterprises, disappearing defendants, and hidden assets. Unlike the absentee defendants in the cases upon which Plaintiffs rely, SunFrog is here defending itself. Had Plaintiffs started a dialogue with SunFrog earlier, this matter may have been resolved without the use of judicial resources. SunFrog is not the criminal enterprise Plaintiffs attempt to paint it as. SunFrog runs an innovative ISP that some third parties have misused. It is, with the exception of the local hospital, perhaps the largest employer in Gaylord, Michigan. SunFrog has spent years looking for common ground first and litigating as a last resort. It is still looking for common ground in this case. Plaintiffs are looking for an undeserved windfall of one hundred twenty-eight million dollars ($128,000,000). While Plaintiffs eye their monetary demand, they neglect the record, which lacks any evidence concerning the strength of Plaintiffs' asserted marks, Plaintiffs' reputations, or SunFrog's intent. Plaintiffs instead make slap-dash comparisons to

non-controlling case law produced by radically different fact patterns attempting to legitimize their outrageous settlement demand. They filed suit without a demand letter or prior notice, took no discovery, demanded one hundred twenty-eight million dollars ($128,000,000), and moved for summary judgment with almost no record pertaining to critical issues. SunFrog deserves to have its defenses developed and heard as equally as Plaintiffs' claims. Plaintiffs' motion and callous monetary demand must be denied at this early stage.

**STANDARD OF REVIEW**

"Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *H-D Michigan, Inc. v. Top Quality Serv., Inc.*, No. 04-C-0533, 2006 WL 2547079, at *1 (E.D. Wis. Aug. 31, 2006). "The moving party has the initial burden of demonstrating that it is entitled to summary judgment." *Id.* "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Sandwiches, Inc. v. Wendy's Int'l, Inc.*, 654 F.Supp. 1066, 1070 (E.D. Wis. 1987) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citations omitted)); *see also Celotex Corporation v. Cartrett*, 477 U.S. 317 (1986); *Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490 (7th Cir. 1986). The evidence submitted by the non-movant is to be believed and should be construed in the light most favorable to it. *Sandwiches*, 654 F.Supp. at 1071; *see also H-D Michigan*, No. 04-C-0533, 2006 WL 2547079, *1. The Supreme Court specifically warned that its decisions do not authorize a trial on affidavits. *Id.* at 1071 (citing *Liberty Lobby*, 477 U.S. at 255).

**ARGUMENT**

**I.    PLAINTIFFS' MONETARY DEMAND IS IMPROPER**

Plaintiffs ask the Court to award $128 million dollars in statutory damages. This request is solely based on the Lanham Act's statutory maximum penalty, which was not created for and is not applied to circumstances such as these. Plaintiffs' demand bears no relation to any actual damages, profits, or any other facts of record. Statutory damages may only be awarded to a party damaged by counterfeit trademarks when compensatory damages are not granted for the same violation. *Gabbanelli Accordions & Imports, L.L.C. v. Gabbanelli*, 575 F.3d 693, 698 (7th Cir. 2009) (citing 15 U.S.C. §§ 1117 (c), (d)). In this case, SunFrog provided the relevant sales figures to Plaintiffs during a good faith negotiation. In response, Plaintiffs ask for more than five hundred (500) times that amount by seeking the maximum statutory amount, two million dollars ($2,000,000) per mark per type of good. (Pls.' Mem. Supp. Mot. Partial Summ. J. 4, ECF No. 44.) Plaintiffs do two things, however, that entirely undermine their request for summary judgment to claim the statutory damages demanded in their brief.

First, Plaintiffs must ignore the fact that SunFrog has provided them with financial information related to the sale of the allegedly infringing designs at issue. Plaintiffs' decision to charge into a summary judgment motion demanding the highest payment recited in the Lanham Act is revealed as even more cynical when the facts of this case are compared to the opinions Plaintiffs cite to in supporting their arguments. In an attempt to normalize their requested relief, Plaintiffs cite a string of cases involving actual counterfeiters who manufactured expensive counterfeit luxury goods and then sold through illicit channels. (Pls.' Mem. Supp. Mot. Partial Summ. J. 21.) Statutory damages *are* frequently awarded in these cited cases because career criminals do not keep receipts or show up in court. That is why the second thing Plaintiffs do is attempt to make SunFrog sound like a group of career criminals. But "inferences are drawn in

4

favor of" SunFrog for this analysis. *Wholesale Partners, LLC v. MasterBrand Cabinets, Inc.*, No. 12-C-747, 2013 WL 5506842, *3 (E.D. Wis. Oct. 4, 2013). Plaintiffs' repetitive speculation that SunFrog's actions were willful should not be credited. The cases Plaintiffs cite, discussed below, illustrate the differences between SunFrog, a large job provider in northern Michigan, and the parties for whom statutory damages were created. Even without drawing inferences in SunFrog's favor, the differences between it and the defendants in the cases cited by Plaintiffs are dramatic.

In *Nike, Inc. v. Top Brand Co.*, No. 00 CIV.8179 KMW RLE, 2005 WL 1654859, at *3 (S.D.N.Y. July 13, 2005), cited to support Plaintiffs' request that a punitive component be included in their requested damages, the defendants at issue admitted to willfully dealing in knowingly counterfeit Nike and Adidas goods that they sourced and had made to their specifications. These defendants "sold or brokered" just over two million units of counterfeit goods, which were their only goods. *Id.* In that case, the defendants did not oppose the plaintiff's statement of material facts or plaintiff's motion for partial summary judgment. *Id.* at *2. In *Nike*, the defendants "produced documents to the plaintiffs which appear to have been forged" leading the court to state that "[t]he lack of information about any of the defendants' sales and profits, and the suspect nature of any information that was provided, make statutory damages particularly appropriate" in that case. *Nike, Inc. v. Top Brand Co.*, No. 00 Civ. 8179(KMW)(RLE), 2006 WL 2946472, *2 (S.D.N.Y. Feb. 27, 2006). None of these egregious facts are present here.

In *Sara Lee Corporation v. Bags of New York, Inc.*, 36 F. Supp. 2d 161, 162 (S.D.N.Y. 1999), "[t]he defendants failed to answer the complaint and the court entered a default judgment in favor of [plaintiff] . . . ." The defendants in *Sara Lee* were so secretive that the plaintiff hired investigators who gained access to a showroom and factory where look-a-like designer bags were made and stamped with Coach trademarks. *Id.* at 163. Even *after* the plaintiff and federal

marshals raided the facility, the defendants in *Sara Lee* continued manufacturing illicit goods. *Id.* at 164. In another high fashion lawsuit set in New York and cited by Plaintiffs to rationalize their demand, a group of long practicing criminals who manufactured and sold counterfeit Coach Merchandise were arrested and charged with misdemeanors. *Coach, Inc. v. Zhen Zhen Weng*, No. 13 Civ. 445, 2014 WL 2604032, *3 (S.D.N.Y. June 9, 2014). Again, the defendants "did not keep records of their purchases or sales of merchandise . . . ." *Id.* at 11. "In addition, [the defendants] destroyed relevant documents . . . [and] did not provide any documents pertaining to their numerous arrests or records relating to their sales of Counterfeit Coach Merchandise." *Id.* at 19. Finally, although not as salacious as the other cases cited by Plaintiffs, *H-D USA LLC v. Mayo*, Case No. 14-CV-654-JPS, 2016 WL 7839144, *1 (E.D. Wis. June 6, 2016) is largely the result of another defendant failing to respond to the plaintiff's statement of material facts, which were then treated as uncontested.

In the present case, Plaintiffs inappropriately ask for a trial of competing affidavits. SunFrog contests nearly all of the critical points included in Plaintiffs' Statement of Material Facts. In reality, SunFrog's services utilize cutting edge technology to provide consumers with opportunities that could not have existed even a few years ago. This technology should be given more than a glance, and Plaintiffs should not enjoy the benefit of their self-serving characterization of SunFrog's services. Since Plaintiffs have rushed to place this motion for summary judgment before the Court, Plaintiffs' self-serving characterizations of fact are due little, if any, deference. Viewing the record through the proper lens at this stage in the proceeding quickly shows that Plaintiffs' monetary demand is not in good faith.

Since 2015, SunFrog has experienced explosive growth in its business. (Carol Decl. ¶ 18.) This including a substantial increase in the number of uploads of unique designs per day. At

its height, SunFrog was receiving over 150,000 new designs every day. (Carol Decl. ¶ 25.) Only after significant investments of time and energy into anti-infringement tools did SunFrog discover that many of these designs were created by "bots," or automated computer scripts or programs that uploaded a number of slightly different designs that was not able to be humanly accomplished. (Carol Decl. ¶¶ 27-42.) It was arduous and time consuming for SunFrog to develop the tools it now uses to fight bad actors abusing SunFrog's services. SunFrog did not discover that "bots" were uploading designs to its website until November 2017. (Carol Decl. ¶¶ 42, 43.) The last notice of infringement from Plaintiffs was received on November 15, 2017. After blocking "bots" from accessing its site as they had before, SunFrog was able to reduce the number of user-generated designs submitted each day to roughly ten thousand (10,000). (Carol Decl. ¶ 43.) While still a daunting amount of data, SunFrog has been able to effectively channel its resources to sift through it and prevent bad actors from uploading or sharing designs that Plaintiffs allege infringe upon H-D's Intellectual Property. SunFrog spent a significant amount of time and money to develop the tools it now uses to combat bad actors making use of its website. SunFrog implemented keyword blocking to prevent designs featuring trademarks owned by third parties from appearing live on the website. (Carol Decl. ¶ 30.) SunFrog also expended significant sums of money testing and implementing advanced OCR technologies to screen new designs against third-party intellectual property. (Carol Decl. ¶ 36.) SunFrog further implemented training for its employees so that, in the off chance that they interact with goods printed by SunFrog's users in a manner that allows them to view the design, they will recognize potential infringements. (Carol Decl. ¶ 37.) At least a portion of this training was directed specifically to Plaintiffs' marks. SunFrog continues to work with its staff to identify and prevent third parties from using its services to infringe on another party's intellectual property. And SunFrog's efforts

appear to be successful because it has not received a notice of infringement since November 15, 2017.

Plaintiffs filed this action without sending any advance demand letter. (Carol Decl. ¶¶ 54, 55.) The parties conducted mediation in September 2017. During this meditation, Defendant turned over its financial records relating to the alleged infringement. These records show two hundred forty-one thousand six hundred one dollars and three cents ($241,641.03) in gross sales with a net profit of fifty-eight thousand three hundred fourteen dollars and twenty-four cents ($58,314.24). During mediation, the parties reached an agreement in principle. However, SunFrog, dealing with its then fluctuating financial condition and on advice of counsel, did not sign the settlement agreement for fear of finding itself in immediate breach by virtue of an inability to make the required payment. In response, Plaintiffs now ask for $128 million dollars. This figure bears no relation to Defendant's actual profits or Plaintiffs' actual losses. Plaintiffs have provided no evidence regarding damage to their licensing business. Plaintiffs' settlement demand is divorced from reality and precedent in the Seventh Circuit, where "[s]tatutory damages should represent some approximation of actual damages and are not to represent a windfall to a prevailing plaintiff." *Coach, Inc. v. Treasure Box, Inc., No. 3:11CV468-PPS*, 2014 WL 888902, at *4 (N.D. Ind. Mar. 6, 2014).

## II.     PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT IS PREMATURE BECAUSE NO DISCOVERY HAS BEEN TAKEN

It is axiomatic that, in trademark cases, summary judgment is disfavored. *See RDK Corp. v. Larsen Bakery, Inc.*, No. 02-C-0675, 2006 WL 2168797, at *2 (E.D. Wis. July 31, 2006). This is because the trademark infringement and false designation of origin tests are questions of fact for a jury. *See AHP Subsidiary Holding Company v. Stuart Hale Company*, 1 F.3d 611, 616 (7th Cir. 1993); *In the Rust Env't & Infrastructure, Inc. v. Teunissen*, 131 F.3d 1210, 1216 (7th Cir.

1997). In trademark cases, the record concerning a likelihood of confusion is often developed through scientifically rigorous survey evidence, which is often introduced through the testimony of expert witnesses. *See Smith Fiberglass Prod., Inc. v. Ameron, Inc.*, 7 F.3d 1327, 1330 (7th Cir. 1993). The traditional trademark defenses, especially in the service provider context, are also questions of fact. *See Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 109 (2d Cir. 2010). Not only are these questions of liability and their associated defenses questions of fact, but the damages requested by Plaintiffs are themselves questions of fact. The Seventh Amendment provides a right to a jury trial on statutory damages. *See Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 355, 118 S. Ct. 1279, 1288, 140 L. Ed. 2d 438 (1998). Thus, the actual damages underlying a claim for statutory damages are a question of fact.

Plaintiff has not served a single discovery request on Defendants. Defendants have not had an opportunity to depose, or even identify, Plaintiffs' witnesses. No facts have been discovered concerning the elements of likelihood of confusion, no surveys have been conducted, and no experts have been named. Plaintiffs have not requested discovery into SunFrog's knowledge of any alleged infringement occurring on its service, and SunFrog has not yet had an opportunity to identify Plaintiffs' actual damages, if any. Plaintiffs' motion for partial summary judgment relies on affidavits from individuals who have not been subject to cross examination. Plaintiffs argue that they are entitled to summary judgment as to:  (1) trademark counterfeiting; (2) trademark infringement; (3) false designation of origin; (4) unfair competition; and (5) trademark dilution. (Pls.' Mem. Supp. Mot. Partial Summ. J. 4, ECF No. 44.) Forgoing discovery, Plaintiffs ask for a trial on affidavits. Yet nearly every material fact bearing on the claims and defenses before the Court is in genuine dispute. Plaintiffs have failed to show that

there are no genuine issues of material fact for trial, and summary judgment is improper at this stage.

## III.   GENUINE ISSUES OF MATERIAL FACT MUST BE ADDRESSED BEFORE CONSIDERING PLAINTIFFS' COUNTERFEITING CLAIM

First, it is unclear that any of the allegedly infringing goods SunFrog's users created and sold were counterfeits. A "counterfeit" is "a spurious designation that is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127. "Although 'spurious' is not a statutorily defined term under the Lanham Act, some courts in [the Second Circuit] have relied on the definition in Black's Law Dictionary:  '[d]eceptively suggesting an erroneous origin; fake.'" *Excelled Sheepskin & Leather Coat Corp. v. Oregon Brewing Co.*, No. 12 Civ. 1416 (GBD)(RLE), 2015 WL 4468083, *3 (S.D.N.Y. July 8, 2015). "The essence of counterfeiting is that the use of the infringing mark 'seeks to trick the consumer into believing he or she is getting the genuine article, rather than a "colorable imitation."'" *Audemars Piguet Holding S.A. v. Swiss Watch Intern., Inc.*, No. 12 Civ. 5423 (LAP), 2015 WL 150756 (S.D.N.Y. Jan. 12, 2015) (quoting *Gucci America, Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 242 (S.D.N.Y. 2012)). "[C]ounterfeiting is an aggravated form of trademark infringement 'that seeks to trick the consumer into believing he or she is getting the genuine article . . . .'" 4 McCarthy on Trademarks and Unfair Competition § 25:10 (quoting *Gucci America, Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 242 (S.D.N.Y. 2012) (Scheindlin, J.). The Second Circuit has explained that even if the literal element of two marks was identical, those marks would not be "substantially indistinguishable" if the font, color, and capitalization were slightly different. McCarthy § 25:10 (citing *Kelly-Brown v. Winfrey*, No. 11 Civ. 7875(PAC), 2012 WL 701262, *8 (S.D.N.Y. March 6, 2012), *rev'd on other grounds*, 717 F.3d 295 (2d Cir. 2013) (citation omitted)). "An alleged counterfeit mark 'must be compared with the registered mark as it appears on actual merchandise

10

to an average purchaser.'" *Kelly-Brown*, No. 11 Civ. 7875(PAC), 2012 WL 701262, *8. In *Audemars*, the Southern District of New York found that even if a defendant's infringing watches featured a trademark that was "indistinguishable" from the plaintiff's, the irregularities in other aspects of the defendant's watch, such as the watch band, precluded defendant's watch from being a counterfeit. 2015 WL 150756 at *2.

Plaintiffs take pride in their robust network of licensees that must "comply with [Plaintiffs'] extensive and stringent quality-control standards." (Pls.' Statement Proposed Material Facts ¶¶ 11, 13, 14, 15, 59, ECF No. 45; Pls.' Mem. Supp. Mot. Partial Summ. J. 12, 13, 29, ECF No. 44.) While Plaintiffs use "infringing" and "counterfeit" interchangeably in parts of their filings, their definitions are not coextensive. A review of the apparel and other goods licensed by Plaintiffs shows that Plaintiffs' high standards have produced uniquely high quality goods. (Pls.' Statement Proposed Material Facts ¶ 19, ECF No. 45.) The images Plaintiffs included of allegedly infringing goods obtained from users of SunFrog's services, on the other hand, broadcast an obviously amateur style that separates such user-generated mockups or goods from Plaintiffs' precisely wound and finished goods. (Pls.' Statement Proposed Material Facts ¶ 57.) SunFrog is unaware of *any* consumer confusion caused by user-generated content on its website. (Carol Decl. ¶ 59.) The differences between Plaintiffs' licensed goods and the user-created t-shirts at issue are even apparent in the low-quality images in Plaintiffs' court filings. Plaintiffs explain that "[a]s part of [the] quality-control review process, H-D carefully reviews the licensed products in numerous respects, including the materials used in making the licensed products, the quality of the craftsmanship and construction of the products, the design, style, and appearance of the products, and the overall quality of the products." (Pls.' Statement Proposed Material Facts ¶ 14.)

The allegedly infringing goods, on the other hand, are digital mockups created by SunFrog's users on home computers or similar devices with user-friendly software that allows users to customize t-shirts and mugs by placing their own images within a predefined area. (Carol Decl. ¶ 6.) Plaintiffs' point out that many of the allegedly infringing designs users uploaded to SunFrog's website would never have made it through Plaintiffs' rigorous quality control program. (Pls.' Statement Proposed Material Facts ¶¶ 61 – 66.) SunFrog agrees. No user of SunFrog's services would view the allegedly infringing designs uploaded by another user and think that Plaintiffs' sponsored those designs. Any party viewing the allegedly infringing designs uploaded by third parties would recognize from the quality of the shirts and designs themselves that he or she was not looking at an item from Plaintiffs' uncompromising licensing program.

Even if the goods were much more alike in terms of quality and design, users on SunFrog's website would *still* know or strongly suspect that the design mockup on the site had not been vetted by Plaintiffs' specialists. Users would know this because they come to SunFrog because it is a user-friendly platform that allows them to upload and sell their *own* designs. SunFrog's users understand that the allegedly infringing designs were uploaded by *other SunFrog users* because that is the service for which users seek out SunFrog. Both the context in which the relevant consumers encounter allegedly infringing user-generated designs *as well as* the inherent quality of any allegedly infringing goods created by SunFrog's users prevent consumers from being tricked into thinking they are obtaining one of Plaintiffs' licensed shirts. The allegedly infringing user-generated mockups are nowhere near "substantially indistinguishable" from Plaintiffs' goods. No relevant consumer would ever purchase an item bearing a user-generated design through SunFrog's website thinking that it was one of Plaintiffs' carefully guarded licensed products. (Carol Decl. ¶ 60.) They would go to Walmart.com, or one

of Plaintiffs' other licensees, for those purchases. Because Plaintiffs' demand of "at least $128,000,000 in Statutory Damages" is dependent on a finding that the allegedly infringing user-generated designs are counterfeit, this is a critical factual determination that is not appropriately decided at summary judgment with almost no record.

## IV. GENUINE ISSUES OF MATERIAL FACT BAR LIABILITY FOR DIRECT TRADEMARK INFRINGEMENT AS WELL AS UNFAIR COMPETITION

As described above, Plaintiffs assume that SunFrog is directly liable for trademark infringement. Plaintiffs' proof is largely limited to the repetition of unsupported allegations. To prove direct trademark infringement, Plaintiffs must show that SunFrog used Plaintiffs' trademarks in commerce and that such use is likely to cause confusion among the relevant consumers. *Ciociola v. Harley-Davidson Inc.*, 552 F. Supp. 2d 845, 857 (E.D. Wis. 2008). Plaintiffs must establish these elements for both trademark infringement and unfair competition claims. *Id.* In the context of trademark infringement, the classification of a mark as weak or strong, the determination of whether a defendant used a mark as a trademark, and the analysis of whether the relevant consumers are likely to be confused as to the origin of the goods at issue are all questions of fact. *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 637 (7th Cir. 2001). In this lawsuit, they are material facts, and they are very much disputed.

### A. SunFrog Does Not Use the Asserted Marks in Commerce or as Trademarks

A trademark is "deemed to be in use in commerce" when "it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto . . ." and the goods are moved or sold in commerce. *GMA Accessories, Inc. v. BOP, LLC*, 765 F. Supp. 2d 457, 463 (S.D.N.Y. 2011) (citing 15 U.S.C. § 1127). Although "trademark use" is not a distinct element in a trademark infringement analysis, "unless the accused use is a trademark use, likelihood of confusion is highly unlikely." *Univ. Healthsystem Consortium v.*

*UnitedHealth Grp., Inc.*, 68 F. Supp. 3d 917, 926-27 (N.D. Ill. 2014) (citing McCarthy § 3:3). Thus, "'trademark use' is … one aspect of the likelihood of confusion requirement for infringement." McCarthy § 23:11.50. SunFrog has not used the Asserted Marks in commerce to indicate the origin or source of its goods or services because it does "use" the marks whatsoever, and any "use" that could possibly be imputed to SunFrog would be for purely ornamental purposes. (Carol Decl. ¶¶ 46-47.)

The designs in question were uploaded to SunFrog's service website by third-parties, not SunFrog, which is readily apparent by the context in which they are presented on the SunFrog.com website. (Carol Decl. ¶¶ 60.) As shown by Plaintiffs' own submissions, SunFrog displays its own trademark on all hang tags and labels affixed to shirts fulfilled by SunFrog. (Carol Decl. ¶ 15.) SunFrog has not placed the Asserted Marks on the tags or labels of its clothing items where consumers would expect to see trademarks as required by 15 U.S.C. § 1127. (Carol Decl. ¶ 46.) At the very least, there are genuine issues of material fact remaining for trial as to whether SunFrog made a trademark use of the Asserted Marks, which bars summary judgment on the issue of likelihood of confusion. *Univ. Healthsystem* at 927.

The Trademark Manual of Examining Procedure ("TMEP") advises that purely ornamental uses like those complained of by Plaintiffs, e.g., placing an image on a t-shirt, do not serve as a trademark uses because such decorative uses do not function as source identifiers. See TMEP § 1202.03. Placing a design on a t-shirt in a merely ornamental manner in a "message-laden expression" is merely ornamental and not a trademark use. *See In Re Power Play Int'l, Inc.*, Serial No. 75/431,077, 2003 WL 1695913, at *2 (T.T.A.B. Mar. 26, 2003) ("In fact, an early Board case on ornamentation introduced a hypothetical example of ornamental matter – the enigmatic saying 'Swallow Your Leader.' Such a message-laden expression (e.g., shown in all

upper-case letters on a hypothetical trademark application drawing page and/or emblazoned across the front of an item of clothing in all plain, block letters) is merely ornamental. Such a slogan or expression, taken by itself, would not be considered as an indication of the source of the clothing on which it appears.").

This case is similar to a recent Southern District of New York case where a court found that a service provider like SunFrog did not use a mark in commerce. *GMA Accessories, Inc. v. BOP, LLC*, 765 F. Supp. 2d 457, 463 (S.D.N.Y. 2011), *aff'd sub nom. GMA Accessories, Inc. v. Elec Wonderland, Inc.*, 558 F. App'x 116 (2d Cir. 2014). The defendant in *GMA Accessories* supplied showroom services to the fashion industry by displaying manufacturers' clothing to potential wholesaler buyers. *Id.* at 461. The defendant earned commissions on the sale of third parties' clothing. *Id.* After several of defendant's employees had been deposed, the defendant was added as a party to an ongoing lawsuit asserting, among other claims, direct trademark infringement. *Id.*

The plaintiff owned a federal trademark registration for CHARLOTTE, and its lawsuit alleged that the defendant was liable for direct infringement because it facilitated the sale of goods bearing the allegedly infringing CHARLOTTE SOLNICKI mark, which were created and provided by a third party. *Id.* Though the defendant maintained samples in its showroom that were labeled CHARLOTTE SOLNICKI, the Southern District of New York found that insufficient to establish direct liability for trademark infringement. In denying liability, the court pointed to several factors: (1) defendant did not place a CHARLOTTE SOLNICKI label on the clothing; (2) defendant's showroom was not labeled CHARLOTTE SOLNICKI; (3) defendant did not exert control over the branding of any CHARLOTTE SOLNICKI product; (4) defendant did not take title to the merchandise; and (5) defendant did not maintain an inventory of

merchandise. *Id*. at 464. The broker in *GMA Accessories* actively facilitated the storage and sale of large quantities of goods, but because the broker did not itself place the allegedly infringing trademark on the goods, the Southern District of New York found it could not be *directly* liable for trademark infringement even though it *had* used the allegedly infringing trademark on paperwork associated with sale of the goods. *Id.* at 463-64. This case is nearly identical. SunFrog does not place labels bearing Plaintiffs' Asserted Marks on clothing—its own marks are reflected on clothing labels. (Carol Decl. ¶ 15.) Its storefront is not labeled with Plaintiffs' Asserted Marks, and it did not exert control over the branding or sale of any products bearing Plaintiffs' Asserted Marks. (Carol Decl. ¶ 14.) SunFrog does not take title to the allegedly infringing goods because they are created on demand, and, as such, SunFrog does not maintain an inventory of merchandise. (Carol Decl. ¶ 13.)

This case is also similar to a fact pattern considered by the Northern District of Ohio. *Tovey v. Nike, Inc.*, No. 1:12CV448, 2014 WL 3510975, at *9 (N.D. Ohio July 10, 2014). In *Tovey*, Mr. Tovey began selling clothing items bearing the terms "Boom Yo!" then obtained a registration of that phrase with the USPTO. In total, Mr. Tovey sold between $3,000 and $5,000 worth of goods bearing "Boom Yo!" Subsequent to Mr. Tovey's sale of these goods, Nike performed a trademark search for the mark BOOM. As a result of this search, Nike became aware of Mr. Tovey's registered mark and, despite this, began advertising and selling goods bearing BOOM. Mr. Tovey discovered Nike's use of BOOM and filed suit. In analyzing Nike's motion for summary judgment, the Court examined the factors that led it to conclude that Tovey had not used "Boom Yo!" as a trademark:

> The evidence cited by Defendant demonstrates that Plaintiff did not use the Boom Yo! mark to identify the source of his goods. Rather, Tovey used the mark—which consists of a common word—in different fonts, font sizes, designs, colors and locations

on his goods. He did not place his mark on hang tags or labels, and he did not designate the phrase Boom Yo! as a trademark on the goods. Accordingly, Plaintiff's use of Boom Yo! lacked the "[c]onsistent and repetitive use of a designation as an indicator of source" that is "the hallmark of a trademark."

*Id*. at *9. The key factors in determining that Tovey had not made a trademark use of Boom Yo! were that: (1) the mark was used in different fonts and designs; (2) it was not used on hang tags or labels; and (3) the phrase was not designated as a trademark on the goods. *Id.*

At the very least, there are genuine issues of material fact remaining for trial as to whether SunFrog can be held liable for direct trademark infringement. Plaintiffs' motion for summary judgment as to its claim that SunFrog directly infringed its asserted trademarks is not appropriately brought at this early stage, and Plaintiffs' motion should be denied.

### B.     Bad Actors on SunFrog's Site Created No Likelihood of Confusion

Consumer confusion in this context concerns the "tendency of the mark[s at issue] to indicate the origin of the [relevant] product[s] in the eyes of the purchasing public." *Patterson v. TNA Entm't, LLC*, No. 04-C0192, 2005 WL 2077353, at *5 (E.D. Wis. Aug. 26, 2005) (citing *Sullivan v. CBS Corp.*, 385 F.3d 772, 777 (7th Cir. 2004)). The Seventh Circuit provides seven non-dispositive factors to guide a likelihood of confusion analysis, namely:  (1) similarities or differences between the marks in appearance and suggestion; (2) similarity or dissimilarity of the goods at issue; (3) scope and manner of concurrent use; (4) degree of care exercised by the relevant consumers; (5) strength of the plaintiff's mark; (6) evidence of actual confusion; and (7) defendant's intent and whether defendant meant to freeride on the goodwill of the senior user. *Packman*, 267 F.3d at 643. Because determining whether a likelihood of confusion exists requires the analysts to question what the typical consumer would think when faced with the marks at issue, "likelihood of confusion is a question of fact, usually reserved for the jury." *Sorensen v. WD-40 Co.*, 792 F.3d 712 (7th Cir. 2015) (citation omitted).

**(1)      Differences Between the Marks/ Strength of Marks**

The fact intensive inquiry involved in most trademark infringement lawsuits is a backdrop that illustrates why moving for summary judgment without the benefit of discovery can place significant, unnecessary burdens on the courts and the parties involved. Plaintiffs have asserted a large volume of trademarks and registrations against SunFrog but have been entirely unwilling to help SunFrog identify bad actors on its website outside of vaguely telling SunFrog, in some cases, that a plain skull, , belongs to Plaintiffs and must be sifted out of a data set so large SunFrog could not possible monitor it for such a simple, non-distinctive image. Unhappy with simple removal from SunFrog's website, Plaintiffs insist on a prior restraint, meaning they expect a company with a well-trafficked website featuring user-generated content to identify and block this, , in real time. This barebones skull shape is nearly devoid of distinctive features that might help to filter it out of images of other skulls that SunFrog's users can upload legitimately. (Carol Decl. ¶ 36.) This basic skull shape also happens to be a favorite on clothing. Even a cursory search of the records held by the USPTO returned hundreds of use-based, live registrations for skull designs for clothing. The Trademark Status & Document Retrieval system printouts showing a sampling of these is attached as **Exhibit A**. Given the pervasiveness of skull designs in the clothing industry, the volume of ill-defined marks asserted against SunFrog, and the poor-quality images transmitted to SunFrog in piecemeal correspondence, it is impossible to summarize the similarities and differences between the marks asserted by Plaintiffs and those Plaintiffs claim are infringing. For example, while Plaintiffs

clearly claim rights in the literal elements of these designs shown below, it is far from clear

whether Plaintiffs view the design elements below as protected by the registration for  :

 

Moreover, as explained above, it is SunFrog's customers that use its service to create t-shirts. SunFrog is making every effort to prevent these users from using SunFrog's services with H-D related designed the customers decide to create. Having an extremely limited ability to ascertain difference between H-D's alleged protection and its customers' alleged infringing uses is made even more difficult by H-D's instance on impossible standards for comparison between design marks. While the literal elements that are clearly asserted by Plaintiffs are easier to analyze, the design elements are far more nuanced. In either event, however, H-D has not provided evidence such as expert surveys or other supporting evidence to demonstrate that consumers recognize there are similarities or difference between the uses. Nor has SunFrog had the opportunity to provide rebuttal expert evidence of that type. Because this analysis relies on the perceptions of relevant consumers, the similarity of the marks cannot be decided on a motion for partial summary judgment with no developed factual record.

(2)     **Scope and Manner of the Current Use**

Without the benefit of discovery, SunFrog cannot evaluate the scope and manner of Plaintiffs' use of the H-D Marks. This is important because SunFrog should be able to explore and evaluate its defenses before a rush for judgment. The manner in which user-generated designs appear on SunFrog's website, the fact that any design is placed on a SunFrog branded shirt from the SunFrong.com website, and the users' expectation that the designs found there are

user-generated, weighs against a finding that the designs created and uploaded by users of SunFrog's site create any real likelihood of consumer confusion that the t-shirts consumers choose to design and print on the SunFrog site somehow actually come from H-D.

### (3) Degree of Care Exercised by the Relevant Consumers

Without the benefit of discovery, this factor remains neutral. Plaintiffs make much of the high quality of their goods. It may be that Plaintiffs' consumers are so discerning that a genuine H-D t-shirt is purchased with great care in contrast to the impulse buy of a user-generated shirt from SunFrog.

### (4) Strength of the Plaintiffs' Marks

At least some of Plaintiffs' asserted marks are extremely weak and may only serve as trademarks when viewed in close proximity to Plaintiffs' other trademarks. **(Exhibits A and B.)** Again, SunFrog should be able develop its defenses through discovery and test – through advese investigation of the facts alleged by H-D – the relative strength of the marks asserted, and whether any of the alleged marks are appropriate for the broad trademark protection H-D asserts.

### (5) There is No Evidence of Actual Confusion

Because of the contexts in which consumers encounter Plaintiffs' goods and the goods developed and spread by end users of SunFrog's software, it is not surprising that no known consumer confusion exists. (Carol Decl. ¶ 59-60.) This factor weighs heavily in SunFrog's favor.

### (6) SunFrog's Intent

Throughout Plaintiffs' filings before the Court, Plaintiffs' speculate on SunFrog's intentions. Plaintiffs have conducted no discovery and have no basis for this projection. What Plaintiffs construe as disregard for their trademark rights was the product of Plaintiffs' weak trademarks and SunFrog's good-faith experimentation with software to prevent infringing content from going live on SunFrog's website. Plaintiffs are asserting an unadorned drawing of a

20

skull as one of their trademarks as well as the two-letter marks HD and H-D. Even in an ideal situation, attempting to filter Plaintiffs' skull outline from its website would result in a skull-free SunFrog, which would unduly burden the rights of its many other users and give H-D an exclusionary scope far beyond its legitimate rights.

### C.      SunFrog is Not Secondarily Liable

As stated in its reply to Plaintiffs' opposition to Defendants' motion to dismiss, this case is nearly identical to *Tiffany v. eBay*. *Tiffany v. eBay* is the seminal case concerning service providers for which the US Supreme Court denied a writ of certiorari. *See Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F.3d 93, 102 (2d Cir. 2010). In *Tiffany*, Tiffany became aware that counterfeit merchandise was sold on eBay's website. In surveys conducted both prior to (2004) and during litigation (2005), Tiffany found that 73.1% and 75.5%, respectively, of the goods purporting to be from Tiffany and purchased from eBay were counterfeit. The *Tiffany* court also found that eBay knew that a large portion of Tiffany goods sold on its website might be counterfeit. Since eBay never saw or inspected the merchandise on its website, its ability to determine whether an item was infringing was limited. Even if it was able to inspect the goods, the court found, it likely would not have had the expertise to determine whether they were counterfeit.

To combat the wide scale counterfeiting on its website, eBay implemented a "fraud engine," which primarily employed keyword searches to identify blatant instances of infringement. *Id.* at 98, 99. It also established a "Verified Rights Owner Program," whereby third parties could report allegedly infringing items to eBay so that it could remove the listings. eBay's practice was to remove reported listings within twenty-four hours of receiving a notice of claimed infringement. eBay also employed a "three strikes rule" for suspending users who repeatedly uploaded infringing designs. Where a seller listed an infringing item and appeared, overall, to be a legitimate seller, however, the infringing items were taken down and an

educational notice would be sent to the seller warning of potential penalties for repeat infringement. At the same time that eBay was working to prevent infringing items from appearing on its service, it was also advertising the availability of Tiffany merchandise on its service in an effort to grow its jewelry and watches category. These advertisements provided the reader with hyperlinks related to Tiffany merchandise, and eBay even went so far as to purchase sponsored-link advertisements on various search engines to promote the availability of Tiffany's goods on its website. Tiffany sued eBay, and, after a bench trial, the District Court for the Southern District of New York found that eBay was not secondarily liable for trademark infringement. The Second Circuit agreed. In analyzing the case, the Second Circuit concluded that, in the service provider context, there are two ways in which a defendant may be held contributorily liable for the infringing conduct of another: "first, if the service provider 'intentionally induces another to infringe a trademark,' and second, if the service provider 'continues to supply its [service] to one whom it knows or has reason to know is engaging in trademark infringement.'" *Tiffany*, 600 F.3d at 106 (quoting *Inwood Labs, Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 854, 102 S. Ct. 2182, 2188, 72 L. Ed. 2d 606 (1982)).

In the case of eBay, the Second Circuit upheld the district court's decision that generalized knowledge of infringement facilitated by eBay's service was not sufficient to establish secondary liability. Specifically, the Second Circuit noted that, "[f]or contributory trademark infringement liability to lie, a service provider must have more than a general knowledge or reason to know that its service is being used to sell counterfeit goods. Some contemporary knowledge of which particular listings are infringing or will infringe in the future is necessary." *Id*. Tiffany argued that the test should be "whether all the knowledge, when taken together, puts [eBay] on notice that there is a substantial problem of trademark infringement." *Id*.

Only then, if eBay fails to act is it "liable for contributory trademark infringement." *Id*. The Second Circuit expressly rejected this test and found that Tiffany, instead, would have needed to show that eBay "knew or had reason to know of specific instances of actual infringement" beyond those that it addressed upon learning of them. *Tiffany*, 600 F.3d at 107. Tiffany sought a similarly broad standard to establish "willful blindness," and the Second Circuit disagreed. Instead, the Second Circuit quoted the words of the Seventh Circuit that "willful blindness is equivalent to actual knowledge for the purposes of the Lanham Act." *Id*. at 110 (citing *Hard Rock Café Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143, 1149 (7th Cir. 1992)). It found that, "eBay did not ignore the information it was given about counterfeit sales on its website" and that "[w]ithout more . . . [such] knowledge [was] insufficient to trigger liability under Inwood." *Id*. Since eBay had not failed to act when notified of infringement by Tiffany, it could not be held liable under the "willful blindness" standard.

Identical to *eBay*, SunFrog has adopted an industry standard notice and takedown procedure. (Carol Decl. ¶ 27.) Plaintiffs have not alleged or presented any evidence that SunFrog has failed to expeditiously respond to Plaintiffs' notices. (Carol Decl. ¶¶ 51, 54.) It is entirely unclear whether any notices provided by Plaintiffs to Defendants were not removed within 48 hours. And Plaintiffs have presented no evidence, and cannot present any evidence, that they notified SunFrog of any issues with its procedures prior to the initiation of this lawsuit. (Carol Decl. ¶ 54.) In fact, the first communication that SunFrog had with Plaintiffs, outside of notices of claimed infringement submitted through SunFrog's web form, occurred after the filing of the Complaint in this matter. (Carol Decl. ¶ 55.) There are no facts in the record supporting the position that SunFrog can be held secondarily liable under *Tiffany* and its progeny.

Plaintiffs argue this case is distinguishable from *Tiffany* because SunFrog maintains printers controlled by its users to print user-generated designs on physical products. But this distinction is analytically unsupportable under *Tiffany*, *Inwood*, and their respective progeny. *See Inwood*, 456 U.S. 844; *Tiffany*, 600 F.3d 93. Neither case hinged on whether the service provider in question provided a service that produced a tangible product instead of a digital one; they hinged on knowledge, and knowledge is rightfully the standard applied by the US Supreme Court in *Inwood*. *See Inwood*, 456 U.S. at 854 ("Thus, if a manufacturer or distributor intentionally induces another to infringe a trademark, or if it continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement, the manufacturer or distributor is contributorily responsible for any harm done as a result of the deceit."). Printing is a legitimate service as much as storing bits on a hard drive and providing auction listings (eBay) or the sale of third-party products (Amazon and Alibaba) are. The physicality of the outcome of the service is not the locus of analysis, and it has never served as the standard in trademark law.

Plaintiffs have produced no evidence establishing that SunFrog had the requisite knowledge under *Tiffany* and *Inwood*, nor could they do so. There are no facts in the record that contradict SunFrog's description of its print-on-demand system as entirely automated and user-directed. (Carol Decl. ¶ 4.) There are no facts showing that SunFrog employees willfully shielded themselves from the alleged infringement of the Asserted Marks by some of SunFrog's users. There are no facts showing that SunFrog employees, who pack shirts for shipping, had specific knowledge of infringement or recognized that a product fell outside of the various licenses held by SunFrog, which holds licenses from large intellectual property providers like Marvel or Disney. There are simply no facts in the record at all.

In order for this court to find SunFrog liable for contributory trademark infringement under *Tiffany*, Plaintiffs would have to prove that SunFrog "knew or had reason to know of specific instances of actual infringement" beyond those that it addressed upon learning of them. *Tiffany*, 600 F.3d at 107. SunFrog has an online notice form which allows rights holders to submit takedown requests referencing user-generated designs listed for sale on SunFrog's website. (Carol Decl. ¶ 27.) Plaintiffs' have provided no evidence showing that SunFrog did not expeditiously remove items after receiving an appropriate notice through this system. Furthermore, Plaintiff never sent a cease and desist letter or engaged in any other communications to alert SunFrog of alleged infringement apart from Plaintiffs' use of SunFrog's online notice and takedown mechanism, which identifies specific user-generated designs. (Carol Decl. ¶¶ 54, 55.) SunFrog's printing process is automated and runs at the direction of its users. SunFrog holds licenses for several properties, ranging from college sports to film properties, and individual SunFrog employees who package items as they flow out of the printers could not discern between shirt designs that are licensed and those that are not. Like eBay, SunFrog did not ignore the complaints made by Plaintiffs, and absent circumstances not found here showing red flag knowledge, SunFrog cannot be held to have had "knowledge" of any other alleged infringement beyond those noticed through its online tool for rights holders.

Similar to *Tiffany*, the California Court of Appeals examined contributory liability for trademark infringement in *Tre Milano v. Amazon.com*. *See Tre Milano, LLC v. Amazon.com, Inc.*, No B234753, 2012 WL 3594380, *13 (Cal. Ct. App. Aug. 22, 2012). Tre Milano, owner of the INSTYLER mark, sued Amazon for trademark infringement because third parties sold identical products bearing the INSTYLER mark through Amazon's website and some of these products were counterfeits. *Id.* at *1. Like eBay, Amazon had adopted a notice of claimed

infringement process under which Amazon removed infringing items within 48 hours of its receipt of a claim. *Id.* at *2. Amazon also reserved the right to block sellers or to remove a listing and simply warn the seller. *Id*. After a lengthy analysis of the *Tiffany v. eBay* case, the Court of Appeals examined whether Amazon could be held to be a contributory trademark infringer. The court found that Amazon was not guilty of contributory infringement because, when it was presented with evidence of infringement, it took action to remove the listings and was not willfully blind to alleged third party infringement on its platform. *Tre Milano*, No B234753, 2012 WL 3594380, *14. Like Amazon, SunFrog should not be held liable for contributory infringement because, as SunFrog asserts, it removed listings when presented with specific allegations of infringement. This fact is in dispute and Plaintiffs' have presented no evidence to the contrary. Given the actual and genuine dispute as to whether SunFrog knew or should have known of the alleged infringement claimed by Plaintiffs and Plaintiffs' failure to cite to any evidence in support of their position concerning SunFrog's knowledge, the court must conclude that there are material facts in dispute related to SunFrog's liability under *Linwood* and *Tiffany*. It is premature to issue summary judgment at this juncture, given the lack of discovery and disputed facts.

## V. PLAINTIFFS' UNFAIR COMPETITION CLAIM MUST FAIL

Section 43(a) of the Lanham Trademark Act and the common law of unfair competition encompass causes of action for trademark infringement as well as a wide range of causes of action for deceitful practices involving the misuse of trademarks. *G. Heileman Brewing Co. v. Anheuser-Busch Inc.*, 676 F. Supp. 1436, 1465 (E.D. Wis. 1987), *aff'd*, 873 F.2d 985 (7th Cir. 1989) (citing *W.H. Brady Company v. Lem Products, Inc.*, 659 F.Supp. 1355, 1364 (N.D. Ill.1987)). The same legal standards are applied to all types of unfair competition claims brought under either federal or state law. *G. Heileman Brewing Co.*, 676 F. Supp. at 1465 (citing *A.J.*

*Canfield Company v. Concord Beverage Company*, 629 F.Supp. 200, 206 (E.D. Pa. 1985), *aff'd sub nom. A.J. Canfield Company v. Honickman*, 808 F.2d 291 (3d Cir. 1986). For the foregoing reasons, Plaintiffs' requested summary judgment is inappropriate and unwarranted as to the trademark infringement claim and the unfair competition claim.

## VI. GENUINE ISSUES OF MATERIAL FACT PROHIBIT FINDING SUNFROG LIABLE FOR FALSE DESIGNATION OF ORIGIN AS A MATTER OF LAW

Section 43(a) of the Lanham Trademark Act, 15 U.S.C. § 1125 (a), prohibits the use of false designations of origin and false descriptions or representations in the advertising and sale of goods and services. One purpose of the Act is curbing deceitful practices in commerce concerning trademarks. Section 43(a) provides in relevant part that:

> (a) Any person who shall affix, apply, or annex, or use in connection with any goods or services, . . . a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, . . . shall be liable to a civil action by . . . any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

15 U.S.C. § 1125 (a); *see also G. Heileman Brewing Co. v. Anheuser-Busch Inc.*, 676 F. Supp. 1436, 1465 (E.D. Wis. 1987), *aff'd*, 873 F.2d 985 (7th Cir. 1989). As described above, SunFrog did not affix, apply, or annex any false designations of origin or otherwise to any of the goods designed and sold by users of SunFrog's system. Furthermore, insofar as a claim for false designation of origin runs parallel to Plaintiffs' trademark infringement claim, it requires a fact intensive inquiry not well suited for resolution on motion for summary judgment before the parties had even conducted discovery.

## VII. GENUINE ISSUES OF MATERIAL FACT MAKE A DILUTION ANALYSIS INAPPROPRIATE AT THIS TIME

A trademark dilution claim requires ownership of a famous and distinctive mark used by another person in commerce after the senior mark has become famous and in a manner that is likely to water down the value of the famous mark as a source indicator. 15 U.S.C. § 1125 (c)(1). "The 2006 Federal Trademark Dilution Revision Act (TDRA) . . . makes it clear that a non-trademark and non-trade name use of the accused designation cannot dilute." McCarthy §23:11:50. There are two types of dilution. Dilution by blurring "occurs when consumers see the plaintiff's mark used on a plethora of different goods and services . . . raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product." *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 466 (7th Cir. 2000) (quotation omitted); see 15 U.S.C. § 1125 (c)(2)(B). Dilution through tarnishment "aris[es] from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark." 15 U.S.C. § 1125 (c)(2)(C). *H-D USA LLC v. Mayo*, No. 14-CV-654-JPS, 2016 WL 7839144, at *1–2 (E.D. Wis. June 10, 2016), judgment entered, No. 14-CV-654-JPS, 2016 WL 7839145 (E.D. Wis. Sept. 8, 2016). "Dilution, like likelihood of confusion, is a question of fact . . . ." *Jordache Enterprises, Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1489 (10th Cir. 1987). This question of fact must be rigorously examined because while "[a]ll 'trademarks' are 'distinctive'—very few are 'famous.'" *Miramar Brands Group, Inc. v. Fonoimoana*, Case No. CV 16-4224 PSG (RAOx), 2017 WL 2903256, *10 (C.D. Cal. June 13, 2017) (citing McCarthy § 24:104 at 24-286, 24-293). "The finding of a mark as famous is 'a rigorous standard . . .'" *Id.* (citations omitted). In *Miramar*, the court granted summary judgment to the *defendant* as to plaintiff's dilution claim because the plaintiff's argument that "its marks [were] famous because they [had] been

registered for more than thirty years and the brands [had] earned millions of dollars in licensing revenues and royalties" was insufficient to prove the marks were famous. *Id.*

Plaintiffs in this case claim that the marks HARLEY-DAVIDSON, HARLEY, H-D, HD, and the Bar & Shield logo are famous for the purposes of dilution. Plaintiffs offer little more than general descriptions of promotional expenditures and revenue to support their contention that these marks are famous. (Pls.' Br. Supp. Mot. Summ. J. 10, ECF No. 44.) Plaintiffs also state that other courts have found that two of the five marks they assert are famous. *Id.* It is doubtful, however, that two-letter marks such as H-D and HD could obtain the household recognition needed to be considered famous for the purposes of a dilution analysis. Plaintiffs must provide more than their affidavits to support a finding that H-D's Famous Marks, as defined in Plaintiffs' brief, are famous in the dilution context. And SunFrog should be able to test that evidence through discovery and the adverse process of the American judicial system. Without evidence showing such fame, Plaintiffs are not entitled to summary judgment as to dilution by blurring or dilution by tarnishment. Plaintiffs' motion for partial summary judgment on its dilution claim also fails for another reason. As discussed above, SunFrog has not used any of Plaintiffs' trademarks in commerce. Because this is a threshold issue, Plaintiffs' motion is not supported by undisputed material facts. Plaintiffs' motion for summary judgment as to their dilution claims should be denied.

## CONCLUSION

Because of the many genuine issues of material fact that are in dispute, SunFrog respectfully asks that Plaintiffs' motion for partial summary judgment be denied in its entirety.

Dated:  December 22, 2017

Respectfully submitted,

/s/ Eric Misterovich
Eric Misterovich
eric@revisionlegal.com
John Di Giacomo
john@revisionlegal.com
REVISION LEGAL, PLLC
8051 Moorsbridge Road
Portage, MI 49024
Telephone: (269) 281-3908

Aaron T. Olejniczak (#1034997)
aarono@andruslaw.com
Christopher R. Liro (#1089843)
chris.liro@andruslaw.com
ANDRUS INTELLECTUAL PROPERTY LAW, LLP
100 East Wisconsin Avenue, Suite 1100
Milwaukee, WI 53202
Telephone: (414) 271-7590
Facsimile: (414) 271-5770

*Attorneys for Defendant SunFrog, LLC*